T.C. Memo. 2010-203

UNITED STATES TAX COURT

LR DEVELOPMENT COMPANY LLC, TRANSFEREE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8836-06.                   Filed September 16, 2010.

Jenny L. Johnson, Ziemowit T. Smulkowski, and Denis J.
Conlon, for petitioner.

Lawrence C. Letkewicz, David B. Flassing, and Justin D.
Scheid, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge: Respondent determined that petitioner LR
Development Co. LLC is liable as a transferee for the deficiency
of $7,507,972 in, and the accuracy-related penalty under section

6662(a)[1] of $1,501,594.50 on, the Federal income tax (tax) of Bruce C. Abrams, Inc. (BCA),[2] for BCA's short taxable year ended December 31, 2000, as well as interest thereon as provided by law. We must decide whether to sustain respondent's determination. We hold that we shall not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time it filed the petition, petitioner maintained its principal office in Illinois.

In 1988, BCA was incorporated under Illinois law in order to (1) develop high-end residential condominiums in Chicago, Illinois (Chicago), (2) renovate historic buildings in and around Chicago and adapt them to different uses, and (3) develop affordable housing projects in Illinois. At all relevant times prior to August 1, 2000, BCA was an S corporation.

At all relevant times until December 12, 1999, Bruce C. Abrams (Mr. Abrams) was the president and the sole stockholder of BCA. On December 12, 1999, Mr. Abrams died. As a result, Mr. Abrams' estate (Abrams estate) became the sole stockholder of

_____

[1]All section references are to the Internal Revenue Code (Code) in effect at all relevant times. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]From its incorporation, BCA conducted its business under the name "LR Development Co." We shall refer to that corporation as BCA in order to prevent confusion with petitioner LR Development Co. LLC.

BCA. At all relevant times, Mr. Abrams' wife, Nancy Abrams (Ms. Abrams), served as the executrix of the Abrams estate.

Sometime between Mr. Abrams' death on December 12, 1999, and December 30, 1999, Ms. Abrams appointed David Kirshenbaum (Mr. Kirshenbaum) as president of BCA.[3] On January 5, 2000, Ms. Abrams appointed the following individuals as directors of BCA: Her father Byron Canvasser, her brother Robert Canvasser, and Andrew Hochberg.

At all relevant times, the following individuals who constituted the senior management of BCA held the offices in BCA indicated:

| Name | Title |
|------|-------|
| David Kirshenbaum | President |
| Steven Sherman | Chief financial officer |
| Donald Biernacki | Senior vice president-- construction |
| Kerry Dickson | Senior vice president-- development |
| Laura Davis Molk | Senior vice president-- marketing |
| Thomas Weeks | Senior vice president-- for-sale properties |
| David Dresdner | Senior vice president-- commercial properties |
| Kenneth Rice | Senior vice president-- affordable housing |
| Stephen Galler | Senior vice president and general counsel |
| Theodore Weldon | Vice president-- acquisitions |

---

[3]From 1996 until he became president of BCA, Mr. Kirshenbaum had served as its chief operating officer.

| Glen Krandel | Vice president-- information technology |
| Ann Thompson | Vice president and director of architectural design |

(We shall refer collectively to all of BCA's officers listed above, except Mr. Kirshenbaum, as BCA senior management.)

Within a few days after Mr. Abrams' death, Ms. Abrams, as executrix of the Abrams estate, decided to sell the stock of BCA that that estate owned. The Abrams estate was unwilling to cause BCA to sell its assets.

Sometime before early April 2000, Ms. Abrams, as executrix of the Abrams estate, retained Mayer, Brown & Platt (Mayer Brown) to serve as that estate's attorneys with respect to the sale of BCA. On February 1, 2000, Ms. Abrams, as executrix of the Abrams estate, retained Cohen Financial Corp. (Cohen Financial), an investment banking firm with its principal office in Chicago, to assist that estate in valuing and selling BCA.[4] CFC Advisory Services L.P. (CFC Advisory), an entity that Cohen Financial owned, was to provide that assistance. On February 1, 2000, the Abrams estate and CFC Advisory entered into an agreement (CFC engagement agreement) for CFC Advisory to do so.[5]

---

[4]Before Mr. Abrams' death, Cohen Financial had provided financing to BCA for certain of its real estate development projects.

[5]Although the record establishes that CFC Advisory performed the services under the CFC engagement agreement, the parties
(continued...)

On July 1, 1992, The Related Companies, L.P. (Related), a limited partnership, was organized under New York law to acquire, own, develop, finance, operate, maintain, and manage real estate, primarily residential and retail properties. At all relevant times, Stephen Ross (Mr. Ross) owned indirectly the majority of the interests in Related.[6] During those times, Mr. Ross served as chairman of Related. At all relevant times, Jeff Blau (Mr. Blau) owned a limited partnership interest in Related that ranged from 8 percent to 15 percent, depending on each project that Related undertook.[7] On January 1, 2000, Mr. Blau, who had been serving as a senior vice president of Related, became its president. At all relevant times since 1996, Michael Brenner (Mr. Brenner) owned a 1-percent limited partnership interest in Related. During those times, Mr. Brenner served as executive vice president and chief financial officer of that company.

In late December 1999, shortly after Mr. Abrams' death, Mr. Blau learned from a cousin of Ms. Abrams that the Abrams estate

---

[5](...continued)
indicated in the stipulation of facts that Cohen Financial performed certain services under that agreement. Since the CFC engagement agreement is between the Abrams estate and CFC Advisory, we shall refer to CFC Advisory when discussing services performed under that agreement.

[6]The record does not reflect the nature of Mr. Ross' interests in Related.

[7]The record does not explain how Mr. Blau's ownership interest in Related could have varied depending on the project that Related undertook.

planned to sell BCA and certain other assets that that estate owned. At that time, Related decided to attempt to purchase certain assets of BCA.[8] To that end, a representative of Related contacted a representative of the Abrams estate to express an interest in purchasing certain of BCA's assets.[9] Related was unwilling to purchase any stock of BCA. Related wanted to purchase certain assets, and not the stock, of BCA because Related (1) intended to sell certain of BCA's assets that it was able to purchase from BCA within a few years after it had purchased them and wanted to have a cost basis in each such asset, (2) was unwilling to hold stock of a corporation because it wished to conduct its business through pass-through entities as it had in the past, and (3) was concerned about any unknown liabilities that BCA might have had as a result of certain actions that Mr. Abrams had taken as president of BCA.

On December 27, 1999, Byron Canvasser, who was a director of BCA and Ms. Abrams' father, sent a memorandum on behalf of the Abrams estate to Mr. Blau of Related. Byron Canvasser included with that memorandum, inter alia, the following information regarding the respective book values of BCA's assets, as well as

_____

[8]Mr. Blau, Mr. Brenner, and Mr. Ross all participated in the decisionmaking process of Related regarding its interest in purchasing certain assets of BCA.

[9]In certain instances, the record does not establish the identities of the individuals who acted on behalf of the various entities involved in this case.

the respective real estate activities and joint venture activities of BCA, as of September 30, 1999:

| Entity/Joint Venture | BCA's Ownership Percentage | 9/30/99 Book Value |
|---|---|---|
| Real estate activities: | | |
| N.B.A.L. LLC | 99 | ($1,287,725) |
| Diversey & Sheffield LLC | 100 | (661,674) |
| Dearborn & Elm LLC | 100 | (74,247) |
| Ridge Partners LP | 1 | 862 |
| Walton Associates LLC | 99 | (442,380) |
| 3830-32 Lincoln Joint Venture | 50 | 6,523 |
| 310 N. Michigan | 100 | 21,757 |
| Winners LP | 33 | 213,815 |
| Renaissance Partners LLC | -- | 5,000 |
| St. Benedict's Hotel LLC | 1 | (4,699) |
| Total | | (2,222,768) |
| | | |
| Joint venture activities: | | |
| LR Fort Sheridan LLC | 100 | 3,708,699 |
| Mayfair Condominium LLC | 100 | -0- |
| LR Arcade LLC | 100 | 1,000,000 |
| Vision Capital LLC | 20 | 545 |
| Vision AHC LLC | 20 | 204,046 |
| LR Tower LLC | 100 | (690,341) |
| Plaines Town Center LLC | 100 | 12,298 |
| Total | | 4,235,247 |
| Combined total | | 2,012,479 |

In early January 2000, representatives of Related met with respective representatives of the Abrams estate and BCA regarding Related's interest in purchasing certain of BCA's assets. Thereafter through March 2000, respective representatives of BCA, the Abrams estate, and Related conducted initial negotiations and exchanged information in an attempt to reach an agreement regard-

ing the sale to Related of certain assets of BCA.  Those initial negotiations were unsuccessful.

In late March or early April 2000, Ronald Katz (Mr. Katz), one of Related's accountants who was with Rubin & Katz, told a representative of Related about Fortrend International LLC (Fortrend) with which Mr. Katz had worked in the past.  At all relevant times, Fortrend was an investment banking firm in which Jeffrey Furman (Mr. Furman) and Frederick Forster (Mr. Forster) each owned indirectly a 50-percent interest.[10]  Fortrend indicated in certain marketing materials (Fortrend brochure) that it had circulated between 1997 and November 2003 that it "[structured] economic transactions to solve specific corporate tax or accounting problems or to take advantage of related opportunities."  One such problem described in the Fortrend brochure was the "sale of appreciated businesses".  In this regard, the Fortrend brochure stated:

> The sale of appreciated businesses by corporations or
> individuals that hold the businesses directly, or in
> one or more subsidiaries, will often produce substan-
> tial tax liabilities due to the gain on the sale.  This
> tax liability often results in conflicting desired
> transaction structures; the seller wants to sell shares
> to minimize current taxes while the buyer wants to buy
> assets to obtain 1) a step-up in tax basis in the
> assets and 2) the ability to recover the full purchase
> price (including goodwill) through depreciation or am-

---

[10]At all relevant times, Howard Kramer (Mr. Kramer) was a senior managing director of Fortrend.  During 2000, Fortrend employed Randolph Whitney Bae (Mr. Bae) in an undisclosed capacity.

ortization deductions.  Fortrend can often arrange for the sale of the business at a price which substantially increases the seller's after-tax profits.  Similarly, when a client wishes to purchase assets held by a corporation, Fortrend can often negotiate a lower price.

Fortrend described in the Fortrend brochure one of the methods used to solve certain "problems" associated with the sale of appreciated businesses.  In this regard, Fortrend stated in pertinent part in a section of that brochure entitled "BUY STOCK/SELL ASSETS TRANSACTION, EXECUTIVE SUMMARY":

> We are working with various clients who may be willing to buy the stock from the seller and then cause the target corporation to sell its net assets to the ultimate buyer.  These clients have certain tax attributes that enable them to absorb the tax gain inherent in the assets.

> In certain situations the economic cost of the client's involvement is sufficiently low that a seller of stock can increase its after-tax sale proceeds, a buyer of net assets can decrease its after-tax purchase price (on a present value basis), and the client can still make an arbitrage profit.

> *       *       *       *       *       *       *

> As with any transaction, economic substance and proper form are crucial to its success.  Accordingly, in transactions where involvement by such a client may make sense, raising the idea at the earliest stages of a transaction is advisable.

No one at Related had been familiar with Fortrend or had had any contacts or dealings with it before Mr. Katz talked to a representative of Related about Fortrend.  Mr. Katz explained to that representative that Fortrend had engaged in certain transactions in which it had acquired the stock of a company and there-

after sold that acquired company's assets. At no time did Related review the Fortrend brochure or conduct any due diligence review regarding Fortrend.

Around late March or early April 2000, Mr. Katz contacted a representative of Fortrend on behalf of Related and met with that representative. Thereafter, representatives of Related introduced representatives of Fortrend to representatives of the Abrams estate for the purpose of discussing whether Fortrend would be able to facilitate the sale of certain assets of BCA to Related in a manner that would satisfy the objectives of both Related and the Abrams estate. Around late March or early April 2000, Related agreed to work with Fortrend with respect to Related's attempt to purchase certain assets of BCA.

Pursuant to the CFC engagement agreement, CFC Advisory prepared an offering memorandum dated March 2000 for BCA (BCA offering memorandum). That offering memorandum stated in pertinent part:

**Executive Summary**

      \*      \*      \*      \*      \*      \*      \*

Although the [Abrams] Estate owns 100% of the shares of * * * [BCA], the Company [BCA] has two compensation plans which provide for employees to receive a 30% interest in cash available for distributions and increases in the net worth of the Company [BCA]. [BCA] * * * stands prepared to consider inquiries that would allow the [Abrams] Estate to liquify their investment

and would provide potential operating and capital partners to the senior management team.

\* \* \* \* \* \* \* \*

**Company Form and Ownership**

\* \* \* \* \* \* \* \*

The senior management team and the employees do not own stock. However, the Corporation [BCA] does have two incentive compensation plans that provide for (1) employees to receive approximately 30% of the annual cash available for distribution and (2) senior managers to participate in the long-term growth of the Corporation's [BCA's] net worth.

The BCA offering memorandum included (1) BCA's balance sheet as of December 31, 1999, that showed total assets with a book value of $7,636,225 and (2) BCA's projections of the cashflows from the various real estate investments and real estate development projects that it owned. CFC Advisory and BCA considered the development project known as the "Northwestern Project" and BCA's 50-percent ownership interest in Park Tower LLC to be two particularly significant assets of BCA.

On March 10, 2000, Mr. Brenner, Related's chief financial officer, sent an email (Mr. Brenner's March 10, 2000 email) to Mr. Blau, Related's president, with a copy to Mr. Ross, Related's majority owner and chairman. Mr. Brenner attached to that email two spreadsheets regarding BCA that he had prepared on the basis of certain available information.[11] One of those spreadsheets

---

[11]The record does not contain the two spreadsheets that Mr.
(continued...)

was a valuation summary of the operations and the revenues of BCA and the other was a summary of BCA's payroll. Mr. Brenner indicated in Mr. Brenner's March 10, 2000 email that he believed that Related should submit a bid "in the range of $20-25 million for a 70% interest in the [BCA] business." Mr. Brenner also indicated in that email that he and Mr. Blau would take responsibility for "the negotiation of employment/ownership arrangements with the 12 key employees."

On March 22, 2000, Mr. Blau on behalf of Related sent a letter (Related's March 22, 2000 offer letter) to a representative of the Abrams estate in which Related offered to purchase certain respective assets of the Abrams estate and BCA. That offer letter stated in pertinent part:

> It is the intention of Purchaser [Related] and Seller [the Abrams estate] to transfer to Purchaser all direct and indirect interests in all assets and/or entities which provide revenue to * * * [BCA] or are described in the Offering Memorandum for * * * [BCA] prepared by [CFC Advisory] * * * During the Due Diligence Period, Purchaser and Seller shall in good faith structure the transaction in a tax efficient manner for both Purchaser and Seller.

In Related's March 22, 2000 offer letter, Related offered to purchase from the Abrams estate for $25,500,000 certain of its direct and indirect interests in BCA subject to certain adjust-

---

[11](...continued)
Brenner attached to Mr. Brenner's March 10, 2000 email. Nor does the record establish the period of time to which those spreadsheets pertained.

ments to that purchase price based on certain cashflows accruing to BCA during the period January 1, 2000, to the date on which the purchase closed. Of the $25,500,000 purchase price, $24 million was to be distributed to the Abrams estate at the closing and $1,500,000 was to be set aside for the purpose of paying bonuses to those employees of BCA who continued in BCA's employ for six months after the closing.[12]

On March 28, 2000, Steven Sherman (Mr. Sherman), the chief financial officer of BCA, sent a fax to Mr. Brenner, the chief financial officer of Related. Mr. Sherman included with that fax (1) BCA's respective consolidated balance sheets as of December 31, 1998 and 1999, and (2) a list of the respective entities and the respective assets that the Abrams estate and BCA owned as of those two dates.[13]

A draft dated March 31, 2000 (March 31, 2000 draft response) of a letter dated "April __, 2000", was prepared on behalf of the Abrams estate in response to Related's March 22, 2000 offer

---

[12]Related's March 22, 2000 offer letter also indicated that Related would arrange for debt and equity financing for the development of certain land that BCA was to acquire on or before May 31, 2000, and that was to be used for the Northwestern project.

[13]The list of the entities and the assets that BCA owned as of Dec. 31, 1999, showed BCA's respective tax bases as of that date in those entities and assets.

letter.[14]  In that draft response, the Abrams estate stated:

1.  Structure.  For tax reasons, it is essential
that the transaction be structured as a sale of the
stock of * * * [BCA] rather than as a sale of assets.
At the closing, * * * [BCA's assets] would consist of
the assets and related liabilities described in the
Offering Memorandum dated March, 2000 that we have
provided to you.  Assets of * * * [BCA] that are not
described in the Offering Memorandum would be trans-
ferred out of * * * [BCA] before closing and not be a
part of the transaction. * * *

2.  Price.  We propose that the purchase price be
$28 million plus the $1.5 million that you have offered
to place into a bonus pool for certain * * * [BCA]
employees.  Net cash flows after January 1, 2000 from
assets that are part of the transaction would be de-
ducted from the $28 million, and a credit for taxes
that the Estate would owe as * * * [BCA's] shareholder
for the portion of 2000 prior to the closing would be
added to the $28 million. * * *

3.  Employee Matters.  It needs to be clear in
any transaction that they [sic] key employees have a
right to 30% of * * * [BCA's] equity, subject to an
appropriate vesting schedule. * * *

At a time not disclosed by the record during the first six
months of 2000, certain of BCA's officers submitted to the Abrams
estate an offer to purchase for $16,500,000 the stock of BCA and
certain other business interests that the Abrams estate owned.
The Abrams estate rejected that offer because the purchase price
was too low.

In response to the BCA offering memorandum, CFC Advisory
received on behalf of the Abrams estate four different proposals

---

[14]The record does not establish whether the Abrams estate
sent a final version of the March 31, 2000 draft response to
Related.

to purchase that estate's BCA stock from Fortrend, JDL Development Corp., Lehman Brothers, and Vornado.  In those respective proposals, Fortrend, JDL Development Corp., Lehman Brothers, and Vornado proposed to pay $24.5 million,[15] $26.5 million, $26 million, and $22 million, respectively, for the Abrams estate's stock in BCA.  On April 18, 2000, CFC Advisory made a presentation with respect to those proposals to Ms. Abrams, Byron Canvasser, who was a director of BCA and Ms. Abrams' father, and John Schmidt, an attorney with Mayer Brown, who were the attorneys for the Abrams estate regarding the sale of BCA.

Fortrend's proposal[16] to purchase the stock of BCA from the Abrams estate included a draft letter dated "April ___, 2000".  That proposal letter stated in pertinent part:

> The following is a summary of the basic business terms upon which [FORTREND ENTITY] <u>or an assignee thereof</u> (the "Purchaser"), would be willing to purchase from The Estate of Bruce Abrams (the "Seller") one hundred percent (100%) of the capital stock (the "Stock") of LR Development Company (a/k/a Bruce C. Abrams, Inc.)("LR Development").  [Bracketed material in original.]

> \*      \*      \*      \*      \*      \*      \*

---

[15]Fortrend's offer of $24.5 million was net of a $1.5 million payment that Fortrend proposed to set aside for the purpose of paying bonuses to certain BCA employees.

[16]The draft letter that Fortrend submitted in response to the BCA offering memorandum identified  a "FORTREND ENTITY", and not Fortrend, as the purchaser of the BCA stock.  Although Fortrend did not purchase the BCA stock, for convenience we shall sometimes refer to Fortrend as the purchaser of the BCA stock.

It is the intention of Purchaser to acquire from Seller and Seller to transfer to Purchaser all direct and indirect interests in all assets and/or entities which are described in the Offering Memorandum ("Offering Memo") for LR Development prepared by Cohen Financial, other than those set forth on Schedule 4 hereto (the "Excluded Assets"). * * *

\*       \*       \*       \*       \*       \*       \*

3.   Purchase Price.

(a)   The aggregate purchase price ("Purchase Price") for the Stock shall be an amount equal to:

(i)   Twenty~~-Four~~ Six Million Dollars ~~($24,000,000)~~($26,000,000) * * *

\*       \*       \*       \*       \*       \*       \*

(b)   The Purchase Price will be distributed as follows:

(i)   Twenty~~-Two~~ Four Million Five Hundred Thousand Dollars ~~($22,500,000)~~($24,500,000) * * * of the Purchase Price will be distributed to the Seller at Closing; and

(ii)  One Million Five Hundred Thousand Dollars ($1,500,000) will be placed into a bonus pool for certain employees of LR Development, to be distributed six (6) months after the Closing to such employees which continue to be employees at LR Development at such time. * * *

Fortrend's proposal to purchase the stock of BCA from the Abrams estate also included a draft letter dated "April _____, 2000" from Mr. Blau, president of Related, to Byron Canvasser, a director of BCA.  That draft letter stated in pertinent part:

It is our understanding that you [BCA] have or will be executing a letter of intent (the "Fortrend Letter of Intent") with a client of Fortrend International or an ~~affiliate~~ assignee thereof ("Fortrend") to sell to Fortrend one hundred percent (100%) of the capital stock of * * * [BCA]. As you know, The Related Companies, L.P. ("Related") is negotiating with Fortrend to purchase from Fortrend certain assets listed on Schedule 1 hereto ("LR/Related Assets") currently owned directly or indirectly by * * * [BCA]. * * * Related intends to continue to develop, operate and sell (if applicable) the LR/Related Assets, to continue to pursue development opportunities through Newco and to have Newco employ current employees of * * * [BCA].

    *       *       *       *       *       *       *

(b) Related shall have the right to approve salaries, bonuses and other compensation or benefits for all senior employees at Newco. Related intends to establish at Closing an incentive compensation plan(s) for certain employees of Newco to be determined by Related, pursuant to which thirty percent (30%) of the equity interests in Newco shall be granted to such employees, which interests shall vest over a three-year period and be subject to such other customary terms for similar plans. In addition, Related may elect to require that certain employees of Newco execute at Closing employment agreements (including covenants-not-to-compete).

Around late April 2000, the Abrams estate agreed to sell to Fortrend for $26 million all of the stock of BCA that the Abrams estate owned. Fortrend retained Manatt, Phelps & Phillips, LLP (Manatt), as its attorneys regarding the purchase from the Abrams estate of that estate's BCA stock and any sale by BCA of certain of its assets. Related retained Katten Muchin Zavis (Katten Muchin) as its attorneys regarding any purchase by Related of certain of BCA's assets.

On May 5, 2000, Mr. Kramer, a senior managing director of Fortrend, sent to Mayer Brown, attorneys for the Abrams estate, two copies of a letter of intent dated May 5, 2000 (May 5, 2000 letter of intent) that a representative of Fortrend had executed. In the May 5, 2000 letter of intent, Fortrend set forth the terms under which "Fortrend International, LLC or an assignee or client thereof" offered to purchase from the Abrams estate all of the stock of BCA. In that letter of intent, Fortrend offered to pay $25,125,000 to the Abrams estate for that stock and to set aside $1,375,000 from which Fortrend was to pay bonuses to certain employees of BCA who remained with BCA for six months after the closing of the sale of the stock of BCA. On a date not disclosed by the record, Ms. Abrams agreed to and signed the May 5, 2000 letter of intent on behalf of the Abrams estate.

During the period May through July 2000, respective representatives of the Abrams estate, Fortrend, and Related and their respective attorneys at Mayer Brown, Manatt, and Katten Muchin negotiated the terms of an agreement for the purchase of the BCA stock that the Abrams estate owned.[17] During the same period, respective representatives of Related and Fortrend and their respective attorneys at Katten Muchin and Manatt negotiated the terms of an agreement for the purchase of certain of BCA's

_____

[17]During the negotiations, the purchaser of the BCA stock was not identified. As discussed below, around July 20, 2000, Castanet, Inc., was identified as the purchaser of that stock.

assets.[18]  BCA senior management did not participate in any negotiations regarding the respective terms of the agreement for the purchase of BCA's stock and the agreement for the purchase of certain of BCA's assets.

Before mid-July 2000, during the respective negotiations with respect to the purchase of BCA's stock and the purchase of certain of BCA's assets, BCA and Related were aware (1) that BCA would realize a substantial gain on the sale of certain of its assets, (2) what the approximate amount of that gain would be, and (3) that the assets that BCA was to retain after that sale would have a fair market value of approximately $1 million.  At no time did Related make any inquiry of Fortrend regarding the gain that BCA was to realize as a result of the sale of certain of its assets.  Nor did Related know or ask how BCA and/or Fortrend planned to address any tax attributable to such a sale. At no time did Related know, or inquire as to, what Fortrend intended to do with BCA after the sale of certain of BCA's assets.

Fortrend and Related each spent three weeks in May 2000 conducting due diligence reviews with respect to BCA and the assets that BCA owned.  Part of the due diligence review that Related conducted addressed certain tax issues.  Related prepared

[18]During the negotiations, the purchaser of BCA's assets was not identified.  As discussed below, around July 24, 2000, petitioner was identified as the purchaser of those assets.

a document dated May 4, 2000, and entitled "Tax Due Diligence Issues" that contained a list of 28 questions and concerns that Related wanted to have addressed.  Included in that list were the following questions:

> 5.  Who will be doing appraisals/valuations/cost allocations of the various assets/properties for purposes of doing an IRC Section 1060 allocation? This is critical to this acquisition and needs to be coordinated with Steven Ross' future income projections (AMT, etc.) since some leeway may be available re: inventory-type property (quick write-offs) and real estate (slow write-offs). **Also**, we need a breakdown between land (no write-offs) and other assets (such as goodwill and other intangibles).  **Also**, are there any intangibles that can be written off over 15 years (e.g., trade names, goodwill, going concern, workforce in place, covenants not to compete, etc.)?  **Also**, are there any self-constructed assets that can be written off over a short period (e.g., plans, work processes, blue print library, etc.)?

On June 5, 2000, Mr. Blau, Related's president, sent to respective representatives of, inter alia, Fortrend, BCA, and the Abrams estate a report concerning Related's due diligence review with respect to BCA and its assets that Rubin & Katz had prepared (Rubin & Katz due diligence report) on behalf of Related.  In that due diligence report, Rubin & Katz set forth (1) its findings with respect to the amount of the revenues that it projected Related would generate from each of the assets that Related proposed to purchase from BCA and (2) the differences between those projections and the projections that CFC Advisory had made on behalf of BCA and that were set forth in the BCA offering

memorandum.  On June 6, 2000, Mr. Blau provided to Mr. Kramer additional information regarding the Rubin & Katz due diligence report.

In anticipation that the respective negotiations regarding the purchase of BCA's stock from the Abrams estate and the purchase of certain of BCA's assets from BCA would be successful, certain actions were taken.

Related not only wanted to purchase through a new entity to be formed (purchasing new entity) certain assets of BCA, it also wanted certain members of BCA's management to continue to manage, as employees of that new entity, the assets purchased.  Consequently, around April 2000 Related offered to BCA senior management 30 percent of the equity interests in that new entity provided that BCA senior management agreed to be employees of the purchasing new entity and to continue managing as such the day-to-day operations of the assets of BCA that that entity was to purchase.  After negotiations with respect to that offer, BCA senior management agreed to those terms.  In order to facilitate that agreement, BCA senior management, except Kenneth Rice (Mr. Rice), formed on July 19, 2000, LRD Group LLC (LRD Group) under Delaware law.  BCA senior management, except Mr. Rice, owned all of the interests in LRD Group.

On July 12, 2000, petitioner was formed under Delaware law to be the purchasing new entity.  As of July 31, 2000, LRD Group

and Related LR Development LLC (Related LR)[19] owned 30 percent and 70 percent, respectively, of the interests in petitioner.

On July 13, 2000, Castanet, Inc. (Castanet), was incorporated under Delaware law. Around July 14, 2000, the incorporator elected Alice Dill (Ms. Dill), an employee of Fortrend, as the sole director of Castanet. On July 14, 2000, Ms. Dill, as the sole director of Castanet, elected herself president, secretary, and treasurer of that company.

On July 14, 2000, Castanet sold and issued to Cronulla Corp. (Cronulla) and Signal Capital Associates L.P. (SCALP)[20] 95 percent and 5 percent, respectively, of its common stock. On July 16, 2000, Cronulla sold to SCALP its 95-percent common stock interest in Castanet. As a result, SCALP owned all of the stock of Castanet.

On July 20, 2000, Mr. Bae, an employee of Fortrend, sent a memorandum to Fortrend's attorneys at Manatt with respect to Castanet's purchase of the stock of BCA from the Abrams estate. That memorandum stated in pertinent part:

---

[19]As of July 31, 2000, Related and Yukon Holdings LLC owned 90 percent and 10 percent, respectively, of the interests in Related LR. Mr. Blau, Related's president, was a member of Yukon Holdings LLC. Related LR did not own any interest in LRD Group.

[20]During 2000, Mr. Furman, a 50-percent owner of Fortrend, owned 100 percent of the general partnership interests and 70.79 percent of the total interests in SCALP. During 2000, Mr. Forster, a 50-percent owner of Fortrend, owned 9.5 percent of the total interests in SCALP.

2. <u>Transactional Summary & Closing Sequence</u>

> As you are aware, it is imperative that we provide
> Fred Forster [the owner of 50 percent of the in-
> terests in Fortrend and 9.5 percent of the inter-
> ests in SCALP] with a copy of the transactional
> summary & closing sequence, so that Fred and
> Howard Teig [Fortrend's outside accountant] can
> determine the ownership structure of Castanet,
> Inc. and appropriate solutions to shelter the
> gains in the subject transaction [the sale of cer-
> tain of BCA's assets].

On July 21, 2000, Mr. Bae sent a fax (July 21, 2000 fax) to Don Fitzgerald (Mr. Fitzgerald), an attorney at Manatt, with respect to Fortrend's intention to contribute certain Canadian currency with a high basis and a low value to BCA following Castanet's purchase of BCA's stock and BCA's sale of certain of its assets. In that fax, Mr. Bae stated in pertinent part:

> Annexed hereto is a copy of the flow chart, illustrat-
> ing the buying entity structure. Upon our acquisition
> of * * * [BCA] & disposition of certain assets [of BCA]
> * * * we are contemplating contributing certain Cana-
> dian currencies, which * * * will flow down to Casta-
> net, Inc.

> Please review the enclosed and advise me whether the
> contemplated sheltering plan is bona fide.

> Also, what are the possible tax
> liabilities/ramifications which may arise from making
> the contribution after or before the merging of Percus-
> sion, LLC into Castanet, Inc.?

> Lastly, is Manatt Phelps comfortable in providing a tax
> opinion with regard to this proposed post-closing
> contribution?

Around July 21, 2000, Mr. Fitzgerald made certain handwrit-ten notations on the July 21, 2000 fax. Near Mr. Bae's request

for advice with respect to "whether the contemplated sheltering plan is bona fide", Mr. Fitzgerald wrote "351 + basis only". In addition, Mr. Fitzgerald wrote the following at the bottom of the July 21, 2000 fax: "Discussed with Randy [Bae] sequencing of the downstream merger of Castanet into LR [BCA] to precede contribution of the high basis/low value assets."

Castanet borrowed $28 million (UAFC loan) from Utrecht-American Finance Co. (UAFC), an affiliate of Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. (Rabobank). Castanet intended to use most of that loan to purchase the stock of BCA that the Abrams estate owned.

Related LR borrowed $33 million from Bayerische Hypo-und Vereinsbank AG (Hypo Bank) in order, inter alia, to finance petitioner's purchase of certain of BCA's assets. That loan was evidenced by a document dated July 31, 2000, and entitled "CREDIT AGREEMENT" (Hypo Bank credit agreement). On July 26, 2000, before executing the Hypo Bank credit agreement, Hypo Bank received a memorandum from Richard O'Toole (Mr. O'Toole), an attorney with Paul, Hastings, Janofsky & Walker LLP, the attorneys representing Related and its affiliates with respect to the purchase of certain of BCA's assets. In that memorandum, Mr. O'Toole stated:

> In the process of preparing for this acquisition [of certain of BCA's assets], the Purchaser [petitioner] has asked for our advice as to whether, for federal income tax purposes, the form of these transac-

tions will be respected - i.e., whether the sale of stock in the Company [BCA] from the [Abrams] Estate to Castanet, on the one hand, and the sale of assets from the Company [BCA] to the Purchaser [petitioner], on the other hand, will be treated as independent transactions and not recharacterized by the Internal Revenue Service. We have advised the Purchaser [petitioner] that we believe the correct tax treatment of these events is that each sale should be respected as an independent transaction. We based our advice on (a) the form of the transactions, (b) the fact that Castanet and its owners and the Purchaser [petitioner] and its owners are unrelated parties, (c) each of the parties to these transactions will report the transactions in a manner consistent with their form, (d) Castanet is expected to derive a profit from these transactions and (e) the Purchaser [petitioner] is not acquiring all of the assets held by the Company.

On July 31, 2000, Castanet, Related LR, petitioner, Hypo Bank, Near North Title Insurance Co. (Near North), Rabobank, and UAFC executed a document entitled "**ESCROW AGREEMENT**" (escrow agreement). BCA was not a party to that agreement.

Pursuant to the escrow agreement, Near North was named escrow agent and Rabobank was named subescrow agent in connection with (1) the Abrams estate's sale of its BCA stock to Castanet and (2) BCA's sale of certain of its assets to petitioner. The escrow agreement provided in pertinent part:

RECITALS

    *      *      *      *      *      *      *

    C.    It is contemplated under the Stock Purchase Agreement [the agreement for the purchase of BCA's stock] that Castanet will pay or cause to be paid $25,410,295 net of proceeds and adjustments (the "Stock Purchase Price") to the [Abrams] Estate on the date hereof.

D.    It is contemplated under the Asset Purchase Agreement [the agreement for the purchase of certain of BCA's assets] that Purchaser [petitioner] will pay or cause to be paid $25,779,369 net of proceeds and adjustments (the "Asset Purchase Price") to Castanet on the date hereof.

        *        *        *        *        *        *        *

G.    Hypo Bank shall deposit the Asset Purchase Price into an escrow account held by Sub-Escrow Agent [Rabobank] (such amount to be referred to herein as the "Asset Purchase Escrow Amount").

H.    The Sub-Escrow Agent [Rabobank] will hold the Asset Purchase Escrow Amount in * * * Castanet Purchase Escrow Account I, Account No. * * * 9107 * * * (the "Asset Purchase Escrow Account").[21]

I.    UFAC [sic] shall deposit the Stock Purchase Price into an escrow account held by Sub-Escrow Agent [Rabobank] (such amount to be referred to herein as the "Stock Purchase Escrow Amount" * * *).

J.    The Sub-Escrow Agent [Rabobank] will hold the Stock Purchase Escrow Amount in * * * Castanet Purchase Escrow Account II, Account No. * * * 9116 * * * (the "Stock Purchase Escrow Account").

AGREEMENT

        *        *        *        *        *        *        *

2.    Deposits and Establishment of the Escrow Fund.

        *        *        *        *        *        *        *

---

[21]The escrow agreement required Hypo Bank on behalf of petitioner to deposit with the escrow agent Rabobank the funds representing the price that petitioner agreed (as discussed below) to pay to purchase certain of BCA's assets. That agreement required Rabobank to credit those funds to Castanet's account No. 9107 maintained at Rabobank. For convenience, we shall discuss Hypo Bank's and/or petitioner's deposit of the funds representing the price that petitioner agreed to pay to purchase certain of BCA's assets as being a deposit of those funds into that account of Castanet.

(b)  Pursuant to the Credit Agreement [between Hypo Bank and Related LR dated July 31, 2000], Hypo Bank shall deliver to the Sub-Escrow agent [Rabobank] the Asset Purchase Escrow Amount on the date hereof. The Sub-Escrow Agent [Rabobank] shall hold the Asset Purchase Escrow Amount and all interest and other a-mounts earned thereon * * * in escrow pursuant to this Agreement, in the Asset Purchase Escrow Account.

(c)  Pursuant to the Stock Purchase Agreement, UAFC shall deliver, or cause to be delivered, to the Sub-Escrow Agent [Rabobank] the Stock Purchase Escrow Amount on the date hereof.  The Sub-Escrow Agent [Rab-obank] shall hold the Stock Purchase Amount and all interest and other amounts earned thereon * * * in escrow pursuant to this Agreement, in the Stock Pur-chase Escrow Account.

   *       *       *       *       *       *       *

4.   Payments from the Stock Purchase Escrow Fund.
* * * Sub-Escrow Agent [Rabobank] shall pay to (a) the [Abrams] Estate an amount equal to $23,202,795 by wire transfer * * * and (b) to Escrow Agent [Near North] an amount equal to $2,207,500 * * * by wire transfer * * *

5.   Payments from the Asset Purchase Escrow Fund.

(a)  If and only if (i) the Sub-Escrow Agent [Rab-obank] has received the Release Notice and (ii) the Sub-Escrow Agent [Rabobank] has previously made the wire transfers described in the first sentence of Sec-tion 4 above, then Sub-Escrow Agent [Rabobank] shall pay (A) to UAFC on behalf of and for the account of Castanet, that portion of the Asset Purchase Escrow Amount equal to the amount owed to UAFC by Castanet, and (B) all other amounts in the Asset Purchase Escrow Account, if any, to Castanet or to such other Person as directed by Castanet.

Under the escrow agreement, (1) petitioner was required to pay the funds representing the price that petitioner was to pay to purchase BCA's assets into an escrow account of Castanet at Rabobank that Castanet controlled, (2) petitioner was not re-

quired to pay those funds into an account that BCA controlled, and (3) those funds were required to be used to repay Castanet's debt to UAFC.[22]  BCA had no right under the escrow agreement to receive and/or to control those funds.

In late July 2000, the respective negotiations regarding the purchase of BCA's stock and the purchase of BCA's assets, as well as the actions taken in anticipation of the success of those negotiations, were successfully completed.  On July 31, 2000, Castanet and the Abrams estate executed a document entitled "**STOCK PURCHASE AGREEMENT**" (SPA) under which the Abrams estate agreed to sell and Castanet agreed to buy all of the stock of BCA that the Abrams estate owned for $25,410,295.  The SPA provided in pertinent part:

> This Stock Purchase Agreement (this "Agreement"), dated as of July 31, 2000 (the "Closing Date"), is between Castanet, Inc., a Delaware corporation ("Buyer"), and The Estate of Bruce C. Abrams (the "Seller").

> \*       \*       \*       \*       \*       \*       \*

> **1.2  PURCHASE PRICE.**  The purchase price for the Shares, is $25,410,295 payable in cash by wire transfer as designated by Seller.

> \*       \*       \*       \*       \*       \*       \*

---

[22]UAFC lent Castanet $28 million, which was more than the price that petitioner was to pay for certain of BCA's assets. Nonetheless, for convenience we shall sometimes state that the funds representing that price were used to repay the UAFC loan or the debt to UAFC.

### 1.4  PURCHASE PRICE ADJUSTMENTS

(a)  An estimate of the income tax benefit available to Seller (the "Estimated Tax Benefit") for the period from January 1, 2000 through July 31, 2000 (the "2000 Period"), based upon the taxable income or taxable losses of the LR Entities (excluding the Excluded Assets) for the 2000 Period, has been computed by the Seller and agreed upon by the Buyer, and such Estimated Tax Benefit is $429,000 (the "Estimated Tax Benefit").  An estimate of the Replacement Tax due by Seller for the LR Entities for the period beginning January 1, 2000 through and including the Closing Date has been computed by Seller and agreed upon by the Buyer, and such Replacement Tax is $75,000 (the "Estimated Replacement Tax").  The Seller shall deposit the sum of the amounts of the Estimated Tax Benefit and the Estimated Replacement Tax ($504,000) into escrow pursuant to the Escrow Agreement (the "Tax Escrow Deposit").

(b)  To the extent the Tax Returns prepared by Seller in accordance with Section 5 (the "Final Tax Returns") show: (i) the amount of income tax benefit available to Seller based upon the actual tax losses of the LR Entities (excluding the Excluded Assets) for the period from January 1, 2000 through the Closing Date (the "Short Period") which is greater than the Estimated Tax Benefit, the Seller shall pay Buyer an amount equal to the difference between the amount of income tax benefit available to Seller based upon the actual tax losses of the LR Entities (excluding the Excluded Assets) as determined from the Final tax Returns for the Short Period and the Estimated Tax Benefit and the parties shall instruct the Escrow agent to pay the full amount of the Estimated Tax Benefit, including any interest or other earnings earned on the Estimated Tax Benefit deposited by Seller pursuant to the Escrow Agreement, to Buyer, (ii) the amount of income tax benefit available to Seller based upon the actual tax losses of the LR Entities (excluding the Excluded Assets) for Short Period which is less than the Estimated Tax Benefit, the parties shall instruct the Escrow Agent to pay to Seller a portion of the Estimated Tax Benefit equal to the difference between the amount of such income tax benefit available to Seller based upon the actual tax losses of the LR Entities (excluding the Excluded Assets) as determined from the Final Tax Returns for the Short Period and the Estimated Tax

Benefit and instruct the Escrow Agent to pay the remainder of the Estimated Tax Benefit, if any, to Buyer, (iii) income tax due by Seller based upon the actual taxable income of the LR Entities (excluding the Excluded Assets) for the Short Period, the parties shall instruct the Escrow Agent to pay the full amount of the Estimated Tax Benefit, including any interest or other earnings earned on the Estimated Tax Benefit deposited by Seller pursuant to the Escrow Agreement, to Seller and the Buyer shall pay to the Seller an amount equal to the income tax due by Seller on the actual taxable income of the LR Entities (excluding the Excluded Assets) for the Short Period as determined from the Final Tax Returns.

\*       \*       \*       \*       \*       \*       \*

**2.    REPRESENTATIONS AND WARRANTIES OF SELLER.**

Seller represents and warrants to Buyer as follows:

\*       \*       \*       \*       \*       \*       \*

**2.10 TAXES.**

(a)   For the purposes of this Agreement, "Tax" or "Taxes" refers to any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities relating to taxes, including, but not limited to, taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts and any obligations under any agreements or arrangements with any other Person with respect to such amounts and including any liability for taxes of a predecessor entity.

(b)   Each of the LR Entities have timely filed, taking into account any extensions, all federal, state, local and foreign returns, estimates, information statements and reports ("Tax Returns") relating to Taxes required to be filed by the LR Entities.  All such Tax Returns are true and correct in all material respects.  With respect to all Taxes imposed on the LR

Entities or any of the Subsidiaries or for which the LR Entities or any of the Subsidiaries is or could be liable, whether to taxing authorities or to other Persons or entities (as, for example, under tax sharing or tax allocation agreements), with respect to all taxable periods or portions of periods ending on or before the Closing Date, all applicable laws and agreements have been fully complied with, and all material Taxes required to be paid by the LR Entities or any of the Subsidiaries to taxing authorities or others on or before the date hereof have been paid. All Taxes required to be paid as of the Closing Date will be paid.

     \*       \*       \*       \*       \*       \*       \*

**4.7 TAX INDEMNIFICATION.**

(a) Subject to the terms and conditions hereof, in the event of a Sale Event which results in a Seller Loss, the Seller shall give to the Buyer written notice of such loss in accordance with this Agreement, and the Buyer shall be obligated to make a payment to Seller as provided in this Agreement (an "Indemnity Payment"). Buyer's obligations under Sections 4.7, 4.8 and 4.9 shall survive the Closing until all applicable statutes of limitation with respect to all Tax Returns have elapsed.

(b) If the Buyer shall be obligated to make a payment to Seller hereunder, the Buyer shall satisfy such obligation by making a payment to the Seller in an amount equal to the Seller Loss plus, to the extent not previously paid, the costs and expenses to be borne by Buyer pursuant to Section 4.8(b).

(c) Any Indemnity Payment required to be made in accordance with the terms hereof shall be made no later than 30 days following the receipt by Buyer of a written demand therefor describing in reasonable detail: (i) the Sale Event and (ii) the amount of the Seller Loss, which demand shall be made no later than 35 days before the due date for payment by the Seller of the Seller Loss; provided however, with respect to any Seller Loss that is being contested pursuant to this Agreement, no Indemnity Payment shall be due until 30 days after a Final Determination with respect to such contest.

## 4.8  TAX CONTESTS.

(a)  <u>Notice</u>.  In the event any taxing authority (i) delivers to Seller any written notices, notifications, audit letters, letters of inquiry or any other written communication that reasonably may result in a Seller Loss or (ii) proposes an adjustment to the tax liability of the Seller or any of the LR Entities, which adjustment, if sustained, could result in an obligation on the part of the Buyer to indemnify the Seller for a Seller Loss, the recipient of such notice (whether it be the Buyer or the Seller) shall promptly upon receipt of notice of such audit or inquiry notify the Seller (if the Buyer is the recipient), or the Buyer (if the Seller is the recipient), in writing, of such proposed adjustment and of any action taken or proposed to be taken by any taxing authority with respect thereto and the Seller, for at least thirty (30) days after receiving such notice from any taxing authority, shall forbear, if such forbearance is permitted by law, from the payment of any Taxes (including interest, penalties and additions to Taxes) asserted to be payable as a result of such proposed adjustment. The recipient shall include with such notification a true, correct, and complete copy of any written communication with any taxing authority, and an accurate and complete summary of any oral communication with such taxing authority.

(b)  <u>Administrative and Judicial Proceedings</u>. Unless otherwise instructed by the Buyer, the Seller agrees to diligently contest any proceeding relating to Taxes with any taxing authority relating to any Sale Event; and the Seller shall keep the Buyer promptly and fully informed of the progress of such contest and shall, if and to the extent requested, permit Buyer to attend any and all conferences with the contesting authority; and consider in good faith any and all advice rendered by the Buyer with respect to the conduct of such contest.  On written request of the Buyer made within thirty (30) days of the receipt of notice of a proposed adjustment, the Buyer shall have the opportunity to be present at and participate in any administrative or judicial proceedings (to the extent permitted by law) relating to Taxes with any taxing authority relating to any Sale Event, but only if (i) the Seller shall have been provided with a written request by the Buyer for the Seller to jointly contest the adjustment

in accordance with this Agreement; (ii) the proposed adjustment is in excess of $50,000; and (iii) the Buyer agrees to bear all of its costs and disbursements associated with such contest. In connection with any contest relating to any Sale Event, the Buyer agrees to pay on demand on an after-tax basis all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorney fees and costs) which the Seller may incur in connection with contesting such claim. The Buyer shall determine the nature of all action to be taken to contest such proposed adjustment * * *. Buyer shall be afforded the opportunity to review and comment on in advance all material submissions relating to any potential Seller Loss. In the event that Seller does not adhere to Buyer's directions in any material respect with respect to the conduct of contesting such claim, Buyer shall not be obligated to make any Indemnity Payment. * * *

(c) Settlement. If, in the course of contesting any claim referred to in this Agreement, any taxing authority shall advise the Seller or the Buyer that it is willing to agree to a settlement of such claim, such party shall notify the other party of such settlement proposal. If, after receipt of such notice, the Buyer so requests, the Seller shall agree to the settlement as proposed by such taxing authority and described to the Buyer.

(d) Payment. If the Buyer or Seller shall have contested any proposed adjustment as above provided, the Buyer shall not be required to indemnify the Seller pursuant to this Agreement with respect to the claim being contested until there occurs a Final Determination with respect to the liability of the Seller for the Seller Loss. If the Buyer shall direct the Seller to contest a proposed adjustment that could result in a Seller Loss by paying the tax claimed (including such other amounts payable as interest, penalties, or additions to tax) and seeking a refund, then the Buyer shall advance to the Seller, on an interest-free basis, the aggregate amount of such taxes, interest, penalties and additions to tax applicable to such proposed adjustment (and shall indemnify the Seller in accordance with this Agreement from any adverse consequences of such advance), and the Seller shall not be obligated to take any further action pursuant to this Agreement unless Buyer shall make such advance. * * *

**4.9 MISCELLANEOUS TAX MATTERS.**

(a) <u>Adjustment to Purchase Price</u>. The amount of any Indemnity Payment under this Agreement shall be treated by the Seller and Buyer as an adjustment to the Purchase Price.

(b) <u>Assumption of Indemnity Obligation</u>. If Buyer sells all or any substantial portion of the assets of the LR Entities, as a condition to such sale, the purchaser(s) of such assets (or an affiliate thereof) (the "Subsequent Buyer") shall be required to assume the indemnity obligations and the liability for Taxes provided for in Section 4.7 (subject to Section 4.8) of this Agreement and in Section 5 of this Agreement and shall be required to meet the following liquidity and other requirements: (i) provide a $3 million letter of credit in form and substance reasonably acceptable to Seller which shall allow the Seller to draw down upon the letter of credit during the Reserve Period in the event that an Indemnity Payment is due in accordance with the Agreement and has not been made; * * * In the event of a sale whereby the Subsequent Buyer assumes the Buyer's indemnity obligations under the Agreement, Buyer shall no longer be liable for such indemnity obligations and the Person assuming such indemnity obligations shall be entitled to all provisions of Sections 4.7, 4.8 and 4.9.

(c) <u>Consistent Tax Reporting Position</u>. Seller and Buyer shall reflect the sale of the Shares as a sale of stock or other ownership interests consistent with the terms of this Agreement for all Tax and other filing and reporting purposes without any disclosure pursuant to Section 6662 or 6111 of the Code. * * *

*     *     *     *     *     *     *

**5. LIABILITY FOR TAXES.**

(a) Except for Taxes that have been provided for as accrued in the computation of Net Working Capital and except as set forth in <u>Section 4.7</u>, Seller shall be responsible for all Taxes imposed on the LR Entities (the "Seller Taxes") for all taxable periods or portions of taxable periods, ending as of one day prior to the Closing Date (the "Pre-Closing Period").

Buyer shall be responsible for all Taxes imposed on the LR Entities (the "Buyer Taxes") for all taxable periods or portions of taxable periods beginning on the Closing Date (the "Post-Closing Period").

(b)  Seller shall cause its accountants, American Express Tax and Business Services Inc. or such other accountants selected by Seller, to prepare the Tax Returns required to be filed by the LR Entities for all Pre-Closing Periods.  * * * Items to be taken into account for the taxable year beginning on January 1, 2000 and ending as of one date prior to the Closing Date (the "Pre-Closing Short Period") shall be determined using the "closing-the-books" method as described in Section 1362(e)(3) of the Code and the regulations thereunder, and the Buyer and Seller agree to make an election, if necessary, under Section 1362(e)(3) of the Code.

(c)  Consistent with the "closing-the-books" method under Section 1362(e)(3) of the Code, Seller shall be responsible for all Seller Taxes attributable to the Pre-Closing Short Period (except to the extent such Taxes have been provided for as accrued in the computation of Net Working Capital and except as provided in Section 4.7). * * * Except as set forth in Section 4.7, Seller shall indemnify and hold Buyer harmless from and against all liability from Seller Taxes attributable for the Pre-Closing Period to the extent such Taxes have not been paid or an accrual therefor has not been included in Net Working Capital.

*      *      *      *      *      *      *

(f)  If Buyer or any of the LR Entities receives a refund, credit or reduction of Taxes attributable to the Pre-Closing Period, Buyer shall promptly reimburse the Seller for such refund, credit or reduction of Taxes.  If Seller or any of the LR Entities receive a refund or reduction of Taxes attributable to the Post-Closing Period, the Seller shall promptly reimburse the Buyer for such refund, credit or reduction of taxes.

(g)  The Buyer and LR Entities shall cause their accountants to prepare and file all Tax Returns required to [be] filed by LR Entities for the taxable year beginning on the Closing Date (the "Post-Closing

Short Period") and all subsequent tax years.  Such Tax Returns shall be prepared on a basis consistent with the items and positions reflected in the Pre-Closing Period Tax Returns and in this Agreement; provided, however, that to the extent Buyer is entitled to make new tax elections, adopt methods of accounting other than those used by Seller or take reporting positions different from those taken by Seller, it may do so, so long as such items and positions could not reasonably be expected to cause any material adverse tax consequences to Seller with respect to the Pre-Closing Period.  Items to be taken into account in the Post-Closing Short Period Tax Returns shall be determined using the "closing-the-books" method as described in Section 1362(e)(3) of the Code and the regulations thereunder, and the Buyer and Seller agree to make an election, if necessary, under Section 1362(e)(3) of the Code.

(h)  Consistent with the "closing-the-books" method under Section 1362(e)(3) of the Code, Buyer shall be responsible for all Buyer Taxes for all taxable periods or portions of taxable periods beginning on the Closing Date (the "Post-Closing Period").  Exemptions, allowances, deductions and any other items that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be allocated between the Pre-Closing Short Period and the Post-Closing Short Period in the proportion which the number of days in each such period bears to the total number of days in the applicable annual period.  If, as of the Closing Date, any of the LR Entities is a partner in a partnership which has a tax year that does not end as of the Closing Date, any item attributable to such partnership's activities shall be allocated among the Pre-Closing Short Period and the Post-Closing Short Period in a manner consistent with Treasury Regulation Section 1.1362-3(c).  In addition to any obligation to Seller under Section 4.7, Buyer shall indemnify and hold Seller harmless from and against all liability from Buyer Taxes attributable to the Post-Closing Period, and for all Taxes attributable to the Pre-Closing Period which have been provided for as accrued in computation of Net Working Capital.

(i)  Any refund of Taxes, credit or reduction of Taxes attributable to the Post-Closing Short Period and all subsequent periods will be for the benefit of Buyer.

\* \* \* \* \* \* \*

**6.  DEFINITIONS.**  For purposes of this Agreement, the following terms have the meanings specified:

\* \* \* \* \* \* \*

***"Excluded Assets"*** - means all the direct and indirect interest of \* \* \* [BCA] in 3169 N. Lincoln Corp., 3830-32 Lincoln Joint Venture, Dearborn & Elm LLC, N.B.A.L. LLC, St. Benedicts Hotel, LLC, 310 N. Michigan, LLC, Vision AHC, LLC and Vision Capital, LLC, and each of the foregoing entities respective holdings.[23]

\* \* \* \* \* \* \*

***"Replacement Tax"*** - means the Illinois Personal Property Replacement tax due by the Company for the Pre-Closing Period.

\* \* \* \* \* \* \*

***"Sale Event"*** - shall mean the sale of all or a substantial portion of the assets of the LR Entities by the Buyer within six months after the Closing that results in any taxing authority assessing or imposing any additional Tax against Seller either as a direct or indirect result of the sale of such assets.

\* \* \* \* \* \* \*

***"Seller Loss"*** - shall mean the amount, if any, of Taxes owed by Seller (including, without limitation, Taxes resulting from the receipt of any Indemnity Payment) to any taxing authority in excess of the amount of Taxes owed to any taxing authority by the Seller with respect to the sale of the Shares, which amount arises from a Sale Event \* \* \*

---

[23]On July 31, 2000, before Castanet and the Abrams estate executed the SPA, the board of directors of BCA adopted resolutions declaring a dividend payable to the Abrams estate consisting of the assets that were defined as "Excluded Assets" in section 6 of the SPA.

Pursuant to the SPA, the Abrams estate sold to Castanet all of the stock of BCA that the Abrams estate owned. Under section 5 of the SPA, Castanet expressly agreed to be responsible for, inter alia, all taxes imposed on BCA for taxable years ending after the closing of the SPA, including any tax attributable to any sale of certain of BCA's assets. Under section 4.9(b) of the SPA, any purchaser of all or a substantial part of BCA's assets was required to assume, inter alia, the taxes for which Castanet agreed to be responsible under section 5 of that agreement.

Effective as of the closing on July 31, 2000, of the Abrams estate's sale of its BCA stock to Castanet, (1) Byron Canvasser, Robert Canvasser, and Andrew Hochberg resigned as directors of BCA, (2) BCA senior management, Mr. Kirshenbaum, and certain other executives of BCA resigned their positions with BCA,[24] and (3) Castanet, as the sole stockholder of BCA, elected Ms. Dill as the sole director of BCA. On July 31, 2000, Ms. Dill, as the sole director of BCA, elected herself president, secretary, and treasurer of that company.

On July 31, 2000, petitioner, Castanet, and BCA executed a document entitled "**ASSET PURCHASE AGREEMENT**" (APA) under which BCA agreed to sell and petitioner agreed to buy substantially all

---

[24]On July 31, 2000, each member of BCA senior management, except Mr. Rice, executed an employment agreement with LR Management Co., a company 100 percent of the stock of which petitioner owned.

of BCA's assets.  The APA provided in pertinent part:

>      This Asset Purchase Agreement (this "Agreement"), dated as of July 31, 2000, is between LR Development Company LLC, * * * ("Buyer"), Castanet, Inc., a Delaware corporation, (the "Seller") and Bruce C. Abrams, Inc., an Illinois corporation, * * * (the "Company"). * * *

>      *        *        *        *        *        *        *

**1.    SALE AND TRANSFER OF ASSETS; CLOSING**

>      **1.1  ASSETS AND ASSUMED LIABILITIES.**

>      (a)  Subject to the terms and conditions of this Agreement, at the Closing the Seller will, or will cause the Company to * * * sell, transfer, convey, assign and deliver to Buyer * * * all of the right, title, and interest in and to certain assets described in this Section 1.1(a) that are owned by the Seller or the Company (as applicable) as of the Closing Date * * * including, but not limited to, the following:

>>          (i)  the equity interests described on <u>Exhibit 1.1-A</u> attached hereto (collectively, the "Equity Interests");

>>          (ii) all Proprietary Rights of the Company;

>>          (iii) the rights of Seller from and after the Closing Date under the Stock Purchase Agreement and rights of Seller under the Escrow Agreement established in accordance with Section 1.4 of the Stock Purchase Agreement;

>      *        *        *        *        *        *        *

>      (b)  Notwithstanding the foregoing, the following properties and assets of the Company are retained by the Company and are expressly excluded from the purchase and sale contemplated by this Agreement (collectively, the "Excluded Assets"):

>      *        *        *        *        *        *        *

>>          (iii) the entities set forth on <u>Exhibit 1.1-B</u> (the "Excluded Entities"); and

(iv) those items identified or described in Section 1.1(a) above, to the extent said items relate solely to the Excluded Entities.

(c) <u>Assumed and Excluded Liabilities.</u>

As of the Closing Date, Buyer will assume and thereafter pay and fully satisfy when due: (A) liabilities arising after the Closing Date under the Applicable Contracts to which the Company is a party or by which the Company is bound or Governmental Authorizations held by the Company and assumed by Buyer pursuant to paragraph (a) of this section 1.1, (B) normal and customary trade accounts payable and accruals (other than income tax accruals) of the Company, in each case arising in the Ordinary Course of Business and only to the extent included in the calculation of Net Working Capital (the "Accounts Payable"), and (C) liabilities and obligations of the LR Entities. All such liabilities and obligations to be so assumed by Buyer are referred to herein as the "Assumed Obligations". Assumed Obligations shall not include (x) any of the items described in subparagraph 1.1(c)(A), (B), or (C) which relate to the Excluded Assets, or (y) any taxes of Seller or the Company of any nature due as a result of the purchase of the Shares by Seller, the sale of the Assets to Buyer, or the sale of the Excluded Assets by the Company.

## 1.2 PURCHASE PRICE.

(a) The purchase price (the "Purchase Price") for the Assets shall be Twenty Five Million Six Hundred Thirteen Thousand Three Hundred sixty Nine and No/100 Dollars ($25,613,369),[25] payable in cash payable [sic] pursuant to the terms and provisions of the Escrow Agreement between Buyer, Seller and escrow agent.

(b) <u>Exhibit 1.2</u> of this Agreement sets forth the allocation of (i) the Purchase Price, plus the (ii) al-

---

[25]Section 1.2(a) of the APA provided that petitioner was to pay $25,613,369 for certain of BCA's assets. Recital D of the escrow agreement provided that petitioner was to pay "$25,779,369 net of proceeds and adjustments" for certain of BCA's assets. The record does not establish the amount of the "proceeds and adjustments" that was to reduce that $25,779,369.

locable liabilities being assumed directly or indi-rectly by Buyer.  The Seller and Buyer agree to make all appropriate tax filings on a basis consistent with the agreed allocation, * * * and not to take a position on any return or in any Proceeding that is inconsistent with the terms of the agreed allocation.

      **1.3  CLOSING.**  The closing of the purchase and sale of the Assets (the "Closing") will take place at the offices of Katten Muchin Zavis, 525 West Monroe Street, Suite 1600, Chicago, Illinois, at 10:00 a.m. (local time) on the Closing Date.

    *      *      *      *      *      *      *

      **6.    DEFINITIONS**.  For purposes of this Agreement, the following terms have the meanings specified:

    *      *      *      *      *      *      *

      ***"Closing Date"*** -- the date and time as of which the Closing actually takes place.

    *      *      *      *      *      *      *

      **7.6  ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS.**  * * * Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

    *      *      *      *      *      *      *

EXHIBIT 1.1-A

EQUITY INTERESTS

100% interest in LR Management Company * * *
100% interest in LR Contracting Company * * *
100% interest in Quality First Contracting Company * * *
100% interest in LR Builders, Inc. * * *
100% interest in Lake Shore, LLC * * *
100% interest in LR Tower LLC * * *
100% interest in LR Fort Sheridan, LLC * * *
100% interest in LR Arcade, LLC * * *
100% interest in Plaines Town Center, LLC * * *
33.33% interest in Limits LLC * * *

33.33% Limited Partnership interest in Winners Limited
    Partnership * * *
100% interest in Ridge Partners LLC * * *

EXHIBIT 1.1-B

EXCLUDED ASSETS

100% interest in Diversey and Sheffield, L.L.C. * * *
100% interest in Walton Associates, L.L.C. * * *

Pursuant to the APA, BCA sold to petitioner the following

assets, some of which were subject to certain liabilities:

| Assets | Fair Market Value |
|---|---|
| Cash | -0- |
| Net current assets | $8,873,149 |
| Prepaid commissions | 500,000 |
| Other assets | 260,484 |
| Furniture and fixtures | 100,000 |
| Leases | 50,000 |
| Equity interests: | |
| Park Tower LLC | 23,223,959 |
| Arcade LLC | 85,206 |
| Lake Shore LLC | 4,420,232 |
| Limits LLC | 170,126 |
| Plaines Town Center LLC | 1,447,596 |
| LR Fort Sheridan LLC | 3,621,026 |
| Lawrence Partners LP | 100 |
| 6133 N. Kenmore LP | 100 |
| Amber Manor LP | 100 |
| Estes Partners LP | 100 |
| Humboldt Ridge LP | 100 |
| Jackson Park LP | 732 |
| Madison Park Place LP | 100 |
| Madison Renaissance LLC | 100 |
| Magnolia Partners LP | 100 |
| New Southtown LP | 100 |
| Ridge Partners LP | 67,387 |
| Sheridan Park Partners LP | 100 |

| | |
|---|---:|
| Union Square LP | 100 |
| Winthrop Partners LP | 100 |
| Winners LP | 1,275,945 |
| Quality First Inc. | 100 |
| LR Contracting Co. | 100 |
| LR Management Co. | 100 |
| Total assets | 44,097,342 |
| Less liabilities | 18,882,973 |
| Total assets net of liabilities | 25,214,369 |

The assets that BCA sold to petitioner and that petitioner purchased from BCA under the APA constituted over 90 percent of the total value, and substantially all, of BCA's assets. The amount that petitioner paid for the assets that it purchased from BCA was equal to their total fair market value.

On July 31, 2000, Castanet, Related, and petitioner executed a document entitled "**ASSUMPTION AGREEMENT**" (assumption agreement). The assumption agreement provided in pertinent part:

> This Assumption Agreement (this "Agreement") is made as of July 31, 2000 by and among CASTANET, INC., a Delaware corporation ("CNI"), THE RELATED COMPANIES, L.P., a Delaware limited partnership ("Related"), and LR Development Company LLC [petitioner], an Illinois limited liability company ("LDC"). CNI, Related, and LDC are collectively referred to herein as the "Parties".

> WITNESSETH:

> WHEREAS, CNI is a party to that certain Stock Purchase Agreement (the "Stock Purchase Agreement") dated July 31, 2000, by and between CNI and the Estate of Bruce C. Abrams (the "Estate") * * *

> WHEREAS, CNI, LDC, and the Company [BCA] have entered into that certain Asset Purchase Agreement (the "Asset Purchase Agreement") dated July 31, 2000, * * *

\*     \*     \*     \*     \*     \*     \*

NOW, THEREFORE, \* \* \* CNI and Related represent, warrant, covenant and agree as follows:

\*     \*     \*     \*     \*     \*     \*

2.    Assignment and Assumption.  LDC hereby accepts and assumes all of CNI's obligations under Sections 1.4(b) \* \* \* and Article V of the Stock Purchase Agreement,[26] and Related hereby accepts and assumes all of CNI's obligations under Sections 4.7, 4.8 and 4.9 of the Stock Purchase Agreement, including without limitation the obligations required of a Subsequent Buyer (as defined in the Stock Purchase Agreement) pursuant to Section 4.9(b)(i) - (iv) of the Stock Purchase Agreement (said obligations are collectively referred to herein as, the "Obligations").  This assumption is effective as of the date hereof and a copy of this Agreement has been delivered to the Estate.

\*     \*     \*     \*     \*     \*     \*

4.4  No Reliance.  Except for any assignees permitted by Section 4.2 of this Agreement and except for the Estate who is hereby made a third party beneficiary to this Agreement:  (a) no third party is entitled to rely on any of the agreements of the parties contained in this Agreement; and (b) the parties assume no liability to any third party because of any reliance on the agreements of the parties contained in this Agreement.

Under section 2 of the assumption agreement, petitioner expressly assumed all of Castanet's obligations under, inter alia, section 5 of the SPA.

On July 31, 2000, Castanet, Related, and petitioner executed a document entitled "**<u>ASSIGNMENT OF STOCK PURCHASE AGREEMENT</u>**",

---

[26]"Article V of the Stock Purchase Agreement" to which section 2 of the assumption agreement referred is section 5 of the SPA.

which the Abrams estate accepted and to which Ms. Abrams agreed on behalf of the Abrams estate on July 31, 2000. That agreement provided in pertinent part:

> 3. Assignment of Representations, Warranties and Covenants.
>
> (a) [Castanet] * * * by these presents, hereby (i) assigns to * * * [petitioner] and its successors and assigns, all of * * * [Castanet's] rights after the Closing Date under the Stock Purchase Agreement including without limitation all rights with respect to the representations and warranties contained in Section 2 of the Stock Purchase Agreement and the rights to indemnification contained in Section 4 of the Stock Purchase Agreement, but expressly excluding the rights assigned to Related under subparagraph 3(a)(ii) below, and (ii) assigns to Related and its successors and assigns all of * * * [Castanet's] rights after the Closing Date under Sections 1.4, 4.7, 4.8, and 4.9 of the Stock Purchase Agreement, in each case except to the extent any rights under such Sections 2 or 4 relate to Excluded Assets under the Asset Purchase Agreement or the business related thereto, but in any event including Excluded Liabilities relating thereto.
>
> (b) Notwithstanding the foregoing, if and to the extent * * * [Castanet] otherwise or the Company [BCA] directly suffers an indemnifiable Loss under Section 4 of the Stock Purchase Agreement, then * * * [Castanet] shall be entitled to recover directly against the [Abrams] Estate with respect thereto pursuant to the terms of the Stock Purchase Agreement.
>
> *     *     *     *     *     *     *
>
> 6.6 No Reliance. Except for any assignees permitted by Section 6.2 of this Agreement and except for the [Abrams] Estate, who is hereby made a third party beneficiary to this Assignment: (a) no third party is entitled to rely on any of the agreements of the parties contained in this Agreement; and (b) the parties assume no liability to any third party because of any reliance on the agreements of the parties contained in this Agreement.

Pursuant to section 1.2 of the SPA and section 2(c) of the escrow agreement, Castanet paid the $25,410,295 purchase price for all of the Abrams estate's BCA stock from a certain account that Castanet maintained at Rabobank (Castanet's account No. 9081 at Rabobank)[27] into a certain escrow account established at Rabobank for the purpose of holding the funds representing that purchase price.

Pursuant to section 1.2(a) of the APA and section 2(b) of the escrow agreement, on August 1, 2000, Hypo Bank[28] deposited on behalf of petitioner the funds representing the purchase price for certain of BCA's assets (asset purchase price) into a certain escrow account maintained at Rabobank on behalf of Castanet (Castanet's escrow account No. 9107 at Rabobank). However, in contravention of the escrow agreement, on the same date Ms. Dill, acting as the sole officer of Castanet, directed Rabobank to transfer the funds representing the asset purchase price from that escrow account to a certain account that BCA maintained at Rabobank (BCA's account No. 9090 at Rabobank). Rabobank complied with Castanet's direction on August 1, 2000. Also on August 1, 2000, Ms. Dill, acting as the sole officer of BCA, directed

[27]Before Castanet's payment of the $25,410,295 purchase price from Castanet's account No. 9081 at Rabobank, UAFC had deposited the $28 million that UAFC had lent to Castanet into that account.

[28]Hypo Bank is the bank that made the loan to Related LR to fund petitioner's purchase of certain of BCA's assets.

Rabobank to transfer the funds representing the asset purchase price from BCA's account No. 9090 at Rabobank to Castanet's account No. 9081 at Rabobank. Rabobank complied with BCA's direction on that date. On August 1, 2000, Ms. Dill, acting as the sole officer of Castanet, requested that Rabobank use any funds in Castanet's account No. 9081 at Rabobank to repay Castanet's debt to UAFC. Rabobank complied with Castanet's direction on August 2, 2000, and used the funds in Castanet's account No. 9081 at Rabobank, including the funds representing the asset purchase price, to repay that debt.[29]

In order to facilitate the contribution of the Canadian currency to BCA that was the subject of the July 21, 2000 fax that Mr. Bae of Fortrend sent to Mr. Fitzgerald, one of Fortrend's attorneys at Manatt, Castanet merged with and into BCA around September 11, 2000. Thereafter, SCALP owned 100 percent of the stock of BCA.

Around September 12, 2000, SCALP made a capital contribution to BCA of $68,000 (Canadian) in which SCALP claimed a tax basis of $17,268,000 (U.S.). (We shall refer to the $68,000 (Canadian) that SCALP contributed to BCA as the Canadian currency.)

On October 11, 2000, Mr. Fitzgerald sent a memorandum to certain other attorneys at Manatt. In that memorandum, Mr.

---

[29]As required by section 5(a) of the escrow agreement, Rabobank had (1) received the release notice and (2) made the transfers described in the first sentence of section 4 of that agreement.

Fitzgerald stated in pertinent part:

> Subsequent to the stock purchase and the asset sale, the Fortrend entity that purchased the stock of * * * [BCA] merged downstream. This left * * * [BCA] as the surviving corporation wholly owned by Signal Capital Associates, L.P. ("SCALP"). SCALP then transferred to * * * [BCA] Canadian currency in the amount of $68,000 (Canadian) but with a tax basis in SCALP's hands stated to be $17,268,000.

> We have been asked to render three tax opinions. First, Fortrend has asked us to provide an opinion as to the dollar amount of pre-contribution tax basis that SCALP had in the Canadian currency. We have no knowledge of this basis. SCALP will have to represent to us this basis figure. Fortrend entities have made such representations to us in other transactions. Second, Fortrend has asked us to provide an opinion that the transfer of the Canadian currency from SCALP to * * * [BCA] qualified under IRC Section 351. This is the same type of opinion we have rendered in other Fortrend transactions. Third, Fortrend has asked us to provide an opinion that * * * [BCA] took a carryover basis in the Canadian currency and the dollar amount of the basis * * * [BCA] had in the Canadian currency. Application of the IRC Section 362 carryover basis rules is a consequence of qualification under IRC Section 351. We would just use the basis dollar amount represented to us by SCALP.

> Our opinions would be addressed solely to SCALP and * * * [BCA], which are now both Fortrend entities. This is an "inside" Fortrend opinion. * * *

> Drafts of the tax opinion letter and the representations letter are enclosed. I am sending copies to Fortrend for their simultaneous review. Pursuant to policy decisions our firm has reached concerning Fortrend tax opinions and my review of the documents, I recommend approval of the enclosures.

On October 11, 2000, Mr. Fitzgerald sent a letter (Mr. Fitzgerald's October 11, 2000 letter) to Ms. Dill, the sole officer and the sole director of BCA and an employee of Fortrend,

and attached to that letter "a draft tax opinion letter and a draft representations letter supporting the opinions for the LR Development contribution transaction [the contribution of the Canadian currency to BCA]."[30]

Around October 25, 2000, BCA converted the Canadian currency into U.S. dollars.

On November 1, 2000, BCA and SCALP sent a joint letter (November 1, 2000 representation letter) to Manatt. In that letter, BCA and SCALP made certain representations to Manatt on which Manatt relied in rendering its opinion regarding certain tax issues involved in SCALP's contribution to BCA of the Canadian currency. In the November 1, 2000 representation letter, BCA and SCALP stated in pertinent part:

> Signal Capital Associates, L.P., * * * ("Parent") and Bruce C. Abrams, Inc., * * * ("Subsidiary"), have requested your opinion regarding certain federal income tax consequences of a transaction (the "Contribution") whereby Parent transferred certain Canadian currency in the denomination of $68,000 (Canadian) to Subsidiary.
>
> * * * Parent was the sole shareholder of Subsidiary both before and after the Contribution. Accordingly, Parent joins in the representations and statements in this letter. Parent and Subsidiary understand that the conclusions in your opinion letter are dependent in part on the accuracy of this representations letter and that your opinion could be adversely affected if this representations letter is not true, correct and complete.
>
>     *       *       *       *       *       *       *

---

[30]The record does not contain the "draft tax opinion letter" or the "draft representations letter" to which Mr. Fitzgerald referred in Mr. Fitzgerald's October 11, 2000 letter.

Parent and Subsidiary have asked you to address solely the federal income tax consequences of the Contribution that are specifically set forth in your draft tax opinion letter referred to above.[31]  Parent and Subsidiary are aware that the Contribution may involve many other tax issues and consequences under the Internal Revenue Code of 1986, as amended (the "Code"), and other tax statutes.  However, Parent and Subsidiary have not asked you to consider or render an opinion regarding such other tax issues.

For purposes of your tax opinion, Parent and Subsidiary represent to you, after due investigation, as follows:

1.   All factual statements in your draft tax opinion letter concerning the Contribution are true, correct and complete.

2.   On September 12, 2000, Parent and Subsidiary took all proper action to transfer from Parent to Subsidiary beneficial ownership of Canadian currency with a denomination of $68,000 (Canadian) and a tax basis of $17,268,000 (U.S.).  Parent's tax basis for the Canadian currency that Parent transferred to Subsidiary was $17,268,000 in the aggregate immediately before the Contribution.

3.   Both Parent and Subsidiary had substantial non-tax business reasons for engaging in the Contribution.  Both Parent and Subsidiary entered into the Contribution with a view toward making an economic profit apart from tax consequences.

4.   Parent and Subsidiary have treated and will treat the Contribution in a manner that is consistent with its form.

5.   At the time of the Contribution and thereafter, Parent owned 100% of the issued and outstanding shares of Subsidiary.  Due to its ownership of all of the Subsidiary stock, issuance of more Subsidiary shares to Parent in connection with the Contribution would have been meaningless.  For this reason, Subsidiary did not issue shares to Parent as a result of the contribution.

---

[31]See _supra_ note 30.

6.    No stock or securities were or will be issued by Subsidiary for services rendered to or for the benefit of Subsidiary in connection with the Contribution.  No stock or securities were or will be issued by Subsidiary for indebtedness of Subsidiary that is not evidenced by a security or for interest on indebtedness of Subsidiary which accrued on or after the beginning of the holding period of Parent for the debt.

7.    Parent neither accumulated receivables nor made any extraordinary payment of payables in anticipation of the Contribution.  Subsidiary has reported and will report items which, but for the Contribution, would have resulted in income or deduction to Parent in a period subsequent to the Contribution and such items have and will constitute income or deductions to Subsidiary when received or paid by Subsidiary.

8.    The Contribution was not the result of solicitation by a promoter, broker or investment house.

9.    Parent did not retain any beneficial ownership in the Canadian currency it transferred to Subsidiary.

10.   Subsidiary did not take the Canadian currency subject to any debt and did not assume any debt of Parent in connection with the Contribution.

11.   There was no indebtedness between Subsidiary and Parent and there was no indebtedness created in favor of Parent as a result of the Contribution.

12.   The Contribution occurred under a plan agreed upon before the Contribution in which the rights of the parties were defined.

13.   There was no plan or intention on the part of Subsidiary to redeem or otherwise reacquire any Subsidiary stock held by Parent.

14.   Taking into account any issuance of additional shares of Subsidiary stock, any issuance of stock for services, the exercise of any Subsidiary stock rights, warrants or subscriptions, any public offering of Subsidiary stock and the sale, exchange, transfer by gift, or other disposition of any of the stock of Subsidiary held by Parent, Parent was in

"control" of Subsidiary within the meaning of Section 368(c) of the Code at the time of the Contribution. At the time of the Contribution, Parent was not under a binding obligation, and had no plan or intention, to dispose of any portion of its stock in Subsidiary following the Contribution.

15. Subsidiary and Parent each paid their own expenses incurred in connection with the Contribution.

16. At the time of the Contribution, Subsidiary was not an "investment company" within the meaning of Section 351(e) of the Code.

17. You may rely on the accuracy of the representations herein for purposes of your tax opinion letter without further inquiry or independent investigation.

18. Parent and Subsidiary hereby consent to your reference to this representations letter in your tax opinion letter.

19. The undersigned have undertaken such investigation as the undersigned deemed necessary to ensure the accuracy of the foregoing representations.

On November 1, 2000, Manatt sent a tax opinion letter

(Manatt's November 1, 2000 tax opinion letter) to BCA and SCALP.

In that tax opinion letter, Manatt stated in pertinent part:

In accordance with your request, we provide the following analysis and opinions relating to certain federal income tax consequences of the transaction (the "Contribution") whereby Signal Capital Associates, L.P., * * * ("Parent"), contributed certain Canadian currency to Bruce C. Abrams, Inc., * * * ("Subsidiary").

At the time of the Contribution, Parent owned all of the issued and outstanding shares of Subsidiary. Subsidiary did not issue any shares of its stock to Parent as a result of the Contribution because (according to Parent) issuance of such shares in exchange for the Canadian currency would have been meaningless (due to the existing ownership by Parent of 100% of Subsidiary).

\*     \*     \*     \*     \*     \*     \*

We have also relied for purposes of this letter on facts set forth in a representations letter from Parent and Subsidiary to us of even date herewith.  Among the representations in that letter are representations that, for federal income tax purposes, Parent's tax basis for the Canadian currency that Parent contributed to Subsidiary was $17,268,000 immediately before the Contribution.  We have assumed, without independent investigation, the accuracy and completeness of all such representations.  If such representations at any time are not true, correct and complete, our opinions could be adversely affected.

Any change or inaccuracy in the facts set forth in the documents specified above[32] or in the above-referenced representations letter could adversely affect our opinions.  \* \* \*.

\*     \*     \*     \*     \*     \*     \*

In the case of transactions such as the Contribution, many federal, state and local income and other tax consequences arise.  We have been asked only to address the issues specifically set forth below.  No opinion is expressed regarding any other issues.

\*     \*     \*     \*     \*     \*     \*

Subject to the foregoing, it is our opinion that, more likely than not:

(a)  The Contribution satisfied the requirements of Section 351 of the [Internal Revenue] Code.

(b)  The tax basis for the Canadian currency transferred from Parent to Subsidiary in the Contribution was a carryover tax basis in accordance with Section 362 of the [Internal Revenue] Code.

---

[32]Manatt's November 1, 2000 tax opinion letter listed various documents on which Manatt relied in rendering its opinions.  We have not quoted the entire opinion letter or described all of the documents on which Manatt relied because they are not material to our resolution of the issues in this case.

(c) Based on the representations made to us in the above-referenced representations letter from Parent and Subsidiary, the carryover tax basis for Subsidiary was $17,268,000 for the Canadian currency contributed to Subsidiary.

On February 8, 2002, BCA dissolved. On the same date, BCA filed with the secretary of state of the State of Illinois articles of dissolution, which Stephen Galler and Thomas Weeks had signed on behalf of BCA on January 14, 2002. Those articles stated that BCA's stockholders had authorized the dissolution of BCA on December 13, 2001.

On or before September 15, 2001, BCA filed Form 1120S, U.S. Income Tax Return for an S Corporation, for the taxable year that began January 1, 2000, and ended July 31, 2000 (7/31/00 BCA return). BCA indicated in the 7/31/00 BCA return that that return was its final S corporation return.

BCA included with the 7/31/00 BCA return Schedule L, Balance Sheets per Books (Schedule L). In that schedule, BCA reported total assets of $25,482,604 as of July 31, 2000, the end of the short taxable year for which that return was filed. BCA also included with the 7/31/00 BCA return a document that stated in pertinent part: "This is to provide notification under Reg. 1.1362-2(b)(1) that Bruce C. Abrams, Inc. terminated its S status effective as of July 31, 2000, due to a transfer of stock to a corporation; thereby terminating its S status under IRC Sec. 1361(b)(1)(B)."

On September 17, 2001, BCA timely filed Form 1120, U.S. Corporation Income Tax Return (Form 1120), for the taxable year that began August 1, 2000, and ended December 31, 2000 (12/31/00 BCA return). In the 12/31/00 BCA return, BCA reported total income of $17,972,779, that included a gain of $16,678,066 from the sale of certain assets that BCA sold to petitioner pursuant to the APA.

In the 12/31/00 BCA return, BCA claimed total deductions of $18,338,661 that included a deduction for a claimed loss of $17,223,844 (Canadian currency loss) for "IRC SEC. 988 loss on foreign currency" (i.e., the Canadian currency that SCALP contributed to BCA). That claimed loss deduction was calculated as the difference between BCA's claimed $17,268,000 carryover basis under section 362 in the Canadian currency and the claimed $44,156 fair market value of that currency at the time BCA converted it into U.S. dollars. In the 12/31/00 BCA return, BCA reported a net operating loss of $365,882 and total tax of zero.

BCA included with the 12/31/00 BCA return Schedule L. In that schedule, BCA reported total assets of $3,277,516 as of December 31, 2000, the end of the short taxable year for which that return was filed.

On September 17, 2002, BCA filed Form 1120 for its taxable year 2001 (12/31/01 BCA return). In that return, BCA stated that its address was in Alexandria, Virginia (last known address). In

the 12/31/01 BCA return, BCA indicated that that return would be its final return.

In the 12/31/01 BCA return, BCA reported total income of $220,721, claimed total deductions of $48,319, and carried forward $172,402 of the $365,882 net operating loss that it had claimed in the 12/31/00 BCA return. In the 12/31/01 BCA return, BCA reported taxable income of zero and total tax of zero.

BCA included with the 12/31/01 BCA return Schedule L. In that schedule, BCA reported total assets of zero as of the end of its taxable year 2001.

Around September 19, 2001, petitioner filed with respondent Form 1065, U.S. Return of Partnership Income, for its taxable year that began July 31, 2000, and ended December 31, 2000. Petitioner included with that form Schedule L. In that schedule, petitioner reported total assets of $78,091,661 as of December 31, 2000, the end of its short taxable year.

On August 13, 2004, respondent issued to the Abrams estate a notice of deficiency (Abrams estate notice) with respect to its taxable year ended October 31, 2000. In that notice, respondent determined, inter alia, that the Abrams estate (1) had failed to substantiate the basis that it had claimed in the stock of BCA that it sold to Castanet under the SPA and (2) had additional ordinary income from BCA. Respondent did not determine in the Abrams estate notice to disregard the Abrams estate's sale of its

BCA stock to Castanet and to treat BCA's sale of certain of its assets as having occurred while the Abrams estate owned the stock of BCA. As a result of the determinations in the Abrams estate notice, respondent determined a deficiency of $14,514,038 in the Abrams estate's tax.

The Abrams estate timely filed a petition with the Court in which it disputed the deficiency that respondent determined in the Abrams estate notice. On February 24, 2006, the Court entered a stipulated decision in that case that there was no deficiency in tax due from the Abrams estate for its taxable year ended October 31, 2000.

On August 13, 2004, respondent issued to BCA at its last known address a notice of deficiency for its taxable year ended December 31, 2000 (BCA notice). In that notice, respondent determined a deficiency of $7,507,972 in BCA's tax for that year. Virtually all of that deficiency resulted from respondent's determination to disallow the Canadian currency loss of $17,223,844 that BCA claimed in the 12/31/00 BCA return. Respondent disallowed that loss "because you [BCA] have failed to establish the basis in the assets or that a loss was otherwise sustained during taxable year 2000 in the amount claimed." In the BCA notice, respondent also determined an accuracy-related penalty under section 6662(a) of $1,501,594.50.

BCA did not file a petition with the Court with respect to the BCA notice. On February 7, 2005, respondent assessed the deficiency and the accuracy-related penalty totaling $9,009,566.50 that respondent had determined in the BCA notice as well as interest thereon as provided by law through that date. (We shall refer to those assessed amounts for BCA's short taxable year ended December 31, 2000, as well as all interest thereon as provided by law after February 7, 2005, as BCA's tax liability.) As of the time of the trial in this case, BCA had not paid any of BCA's tax liability.

On June 18, 2005, respondent opened a collection case, and on June 29, 2005, respondent assigned a revenue officer (first revenue officer) to conduct collection activities with respect to BCA's tax liability. On June 29, 2005, the first revenue officer reviewed respondent's Integrated Data Retrieval System database with respect to BCA.

On July 22, 2005, the first revenue officer went to BCA's last known address. On July 26, 2005, the first revenue officer used certain database systems in order to perform certain research with respect to BCA. On the same date, the first revenue officer requested authorization to file a notice of Federal tax lien (notice of tax lien) with respect to BCA's tax liability. On August 2, 2005, respondent recorded a notice of tax lien with

respect to BCA's tax liability with the Virginia State Corporation Commission.

On July 27, 2005, the first revenue officer reviewed certain data transcripts maintained by the Internal Revenue Service and certain State and local government records relating to BCA in order to identify potential sources of income or assets of BCA on which respondent might levy. The first revenue officer did not identify any such sources from that review.

On July 27, 2005, respondent sent to BCA at its last known address Letter 1058, Notice of Intent to Levy and Notice of the Right to a Hearing (notice of levy). On August 1, 2005, respondent received confirmation that delivery of the notice of levy had been accepted.[33]

On August 31, 2005, the first revenue officer requested assistance from another revenue officer (second revenue officer) in Chicago. The first revenue officer asked the second revenue officer to visit certain offices that petitioner was occupying at the time, which the second revenue officer did on October 4, 2005.

On September 16, 2005, the first revenue officer identified Golden Gate Bank as a potential source on which respondent might levy with respect to BCA's tax liability. On the same date, the

---

[33]The record does not establish who accepted the notice of levy on behalf of BCA. Nor does the record establish whether BCA appealed the notice of levy to respondent's Appeals Office.

first revenue officer mailed to Golden Gate Bank a copy of a notice of levy with respect to that liability.  On September 29, 2005, the first revenue officer terminated the levy action involving Golden Gate Bank because BCA did not maintain any accounts at that bank.   On October 5, 2005, the second revenue officer reviewed certain records maintained by the secretary of state of the State of Illinois.  That review disclosed that BCA had dissolved.  On October 19, 2005, respondent closed as noncollectible the collection case with respect to BCA's tax liability because BCA had dissolved.

At no time did the first revenue officer or the second revenue officer interview or issue a summons to Larry Austin, who had signed the 12/31/00 BCA return as BCA's president.

On April 18, 2006, respondent reopened the collection case with respect to BCA's tax liability and assigned it to respondent's examination division for consideration of possible transferee liability.

Respondent issued to petitioner a notice of liability in which respondent determined that petitioner is liable as a transferee of BCA for BCA's tax liability.

### OPINION

Respondent bears the burden of establishing that petitioner is liable under section 6901 for BCA's tax liability as a trans-

feree of property of BCA (BCA's transferee).[34]  See sec. 6902(a);
see also Rule 142(d).

Section 6901 provides in pertinent part:

SEC. 6901.  TRANSFERRED ASSETS.

(a) Method of Collection.--The amounts of the fol-
lowing liabilities shall, except as hereinafter in this
section provided, be assessed, paid, and collected in
the same manner and subject to the same provisions and
limitations as in the case of the taxes with respect to
which the liabilities were incurred:

(1) Income, estate, and gift taxes.--

(A) Transferees.--The liability, at law or in
equity, of a transferee of property--

(i) of a taxpayer in the case of a tax
imposed by subtitle A (relating to income
taxes),

*       *       *       *       *       *       *

(h) Definition of Transferee.--As used in this
section, the term "transferee" includes * * *
distributee * * *.

Section 6901 does not create or define a substantive liabil-
ity; it merely provides a procedure by which the Government may
collect from a transferee of property unpaid taxes owed by the
transferor of the property.  See Commissioner v. Stern, 357 U.S.

----

[34]Petitioner bears the burden of establishing that BCA is
not liable for BCA's tax liability.  See Rule 142(a), (d).
Petitioner alleged in the petition that respondent erred in
determining that BCA is liable for BCA's tax liability.  Peti-
tioner presented no evidence at trial and advances no argument on
brief that BCA is not liable for BCA's tax liability.  We con-
clude that petitioner has abandoned the allegation in the peti-
tion that respondent erred in determining that BCA is liable for
BCA's tax liability.

39, 42 (1958); <u>Hagaman v. Commissioner</u>, 100 T.C. 180, 183 (1993). The existence and the extent of a transferee's liability are determined under applicable State law. See <u>Commissioner v. Stern</u>, <u>supra</u> at 42-45; <u>Hagaman v. Commissioner</u>, <u>supra</u> at 183-185. The parties agree that the applicable State law here is the law of the State of Illinois.

Respondent relies on the following grounds in support of respondent's position that petitioner is liable under section 6901 as BCA's transferee: (1) Petitioner is liable as BCA's transferee under the assumption agreement; (2) petitioner is liable as BCA's transferee under 740 Ill. Comp. Stat. Ann. 160/1-12 (West 2002) (Illinois fraudulent transfer statute); and (3) petitioner is liable as BCA's transferee under what respondent labels the "trust fund doctrine" (respondent's trust fund doctrine).[35]

---

[35]Respondent does not advance any other argument in support of respondent's position that petitioner is liable under sec. 6901 as BCA's transferee. In fact, respondent expressly abandons two such other arguments. On brief, respondent states:

> Respondent does not seek to recast the BCA Intermediary Transaction as a stock sale by the [Abrams] Estate to petitioner, as in <u>Enbridge Energy Co. v. United States</u>, 553 F.Supp.2d 716 (S.D. Tex. 2008), because petitioners liability as a transferee can be established by following the form of the transaction it adopted. Nor does respondent seek to establish petitioner's liability as a transferee under the Federal Debt Collection Procedure Act, 28 U.S.C. § 3301 <u>et</u> <u>seq</u>.

Claimed Transferee of Property of
BCA Under the Assumption Agreement

Respondent argues that petitioner is liable for BCA's tax liability as BCA's transferee because petitioner assumed that liability under the assumption agreement. In support of that argument, respondent asserts: (1) Pursuant to section 2 of the assumption agreement petitioner assumed from Castanet all of Castanet's obligations under, inter alia, section 5 of the SPA (i.e., the stock purchase agreement) and (2) pursuant to section 5 of the SPA Castanet obligated itself to be responsible for, inter alia, any tax attributable to the sale of certain of BCA's assets to petitioner (asset sale capital gains tax).

Section 2 of the assumption agreement provided in pertinent part: "LDC [petitioner] hereby accepts and assumes all of CNI's [Castanet's] obligations under * * * Article V of the Stock Purchase Agreement". "Article V of the Stock Purchase Agreement" to which section 2 of the assumption agreement referred is section 5 of the SPA. We have found on the record before us that petitioner expressly assumed in section 2 of the assumption agreement all of Castanet's obligations under, inter alia, section 5 of the SPA.

Section 5 of the SPA provided in pertinent part:

> (a) Except for Taxes that have been provided for as accrued in the computation of Net Working Capital and except as set forth in Section 4.7, Seller shall be responsible for all Taxes imposed on the LR Entities (the "Seller Taxes") for all taxable periods or por-

tions of taxable periods, ending as of one day prior to the Closing Date (the "Pre-Closing Period"). Buyer shall be responsible for all Taxes imposed on the LR Entities (the "Buyer Taxes") for all taxable periods or portions of taxable periods beginning on the Closing Date (the "Post-Closing Period").

  *   *   *   *   *   *   *

  (c) * * * Except as set forth in Section 4.7, Seller shall indemnify and hold Buyer harmless from and against all liability from Seller Taxes attributable for the Pre-Closing Period to the extent such Taxes have not been paid or an accrual therefor has not been included in Net Working Capital.

  *   *   *   *   *   *   *

  (f) If Buyer or any of the LR Entities receives a refund, credit or reduction of Taxes attributable to the Pre-Closing Period, Buyer shall promptly reimburse the Seller for such refund, credit, or reduction of Taxes.  If Seller or any of the LR Entities receive a refund or reduction of Taxes attributable to the Post-Closing Period, the Seller shall promptly reimburse the Buyer for such refund, credit or reduction of taxes.

  (g) The Buyer and LR Entities shall cause their accountants to prepare and file all Tax Returns required to be filed by LR Entities for the taxable year beginning on the Closing Date (the "Post-Closing Short Period") and all subsequent tax years.  Such Tax Returns shall be prepared on a basis consistent with the items and positions reflected in the Pre-Closing Period Tax Returns and in this Agreement; provided, however, that to the extent Buyer is entitled to make new tax elections, adopt methods of accounting other than those used by Seller or take reporting positions different from those taken by Seller, it may do so, so long as such items and positions could not reasonably be expected to cause any material adverse tax consequences to Seller with respect to the Pre-Closing Period. Items to be taken into account in the Post-Closing Short Period Tax Returns shall be determined using the "closing-the-books" method as described in Section 1362(e)(3) of the Code and the regulations thereunder, and the Buyer and Seller agree to make an election, if necessary, under Section 1362(e)(3) of the Code.

(h)  Consistent with the "closing-the-books" method under Section 1362(e)(3) of the Code, Buyer shall be responsible for all Buyer Taxes for all taxable periods or portions of taxable periods beginning on the Closing Date (the "Post-Closing Period").  Exemptions, allowances, deductions and any other items that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be allocated between the Pre-Closing Short Period and the Post-Closing Short Period in the proportion which the number of days in each such period bears to the total number of days in the applicable annual period.  If, as of the Closing Date, any of the LR Entities is a partner in a partnership which has a tax year that does not end as of the Closing Date, any item attributable to such partnership's activities shall be allocated among the Pre-Closing Short Period and the Post-Closing Short Period in a manner consistent with Treasury Regulation Section 1.1362-3(c).  In addition to any obligation to Seller under Section 4.7, Buyer shall indemnify and hold Seller harmless from and against all liability from Buyer Taxes attributable to the Post-Closing Period, and for all Taxes attributable to the Pre-Closing Period which have been provided for as accrued in computation of Net Working Capital.

(i)  Any refund of Taxes, credit or reduction of Taxes attributable to the Post-Closing Short Period and all subsequent periods will be for the benefit of Buyer.

We have found on the record before us that Castanet, as the buyer of BCA's stock, expressly agreed in section 5(a) of the SPA to be responsible for, inter alia, BCA's tax liability, including any asset sale capital gains tax of BCA for the short taxable year of BCA that ended December 31, 2000.

Despite the express language of the assumption agreement and of the SPA, petitioner argues that Castanet did not obligate itself to be responsible for BCA's tax liability.  According to petitioner:

Section 5 of the SPA simply means that, as between the stock seller and the stock buyer, the stock seller is responsible for all taxes incurred prior to the closing by BCA and the various entities in which it held an interest, and the stock buyer is responsible for all taxes incurred by those entities after the closing. By standing in Castanet's shoes with respect to this provision, Petitioner agreed that it, as opposed to the Estate or Castanet, would be responsible for making sure that the entities it owned and controlled as a result of the Asset Purchase Agreement ("APA") would pay their tax liabilities. Neither the SPA nor the AA [assumption agreement] eliminated the separate corporate existence of BCA, made Castanet rather than BCA itself liable for BCA's taxes, or made Petitioner liable for the taxes of an entity it never owned or controlled.

We reject petitioner's argument. Section 2 of the assumption agreement and section 5 of the SPA mean what they say. We have found that petitioner expressly assumed in section 2 of the assumption agreement all of Castanet's obligations under, inter alia, section 5 of the SPA. We have also found that Castanet expressly obligated itself in section 5 of the SPA to be responsible for BCA's tax liability. On the record before us, we find that petitioner expressly assumed in section 2 of the assumption agreement Castanet's express obligation in section 5 of the SPA to be responsible for BCA's tax liability.[36]

---

[36]Petitioner also argues that petitioner could not have assumed BCA's tax liability because (1) section 1.1(c) of the APA (i.e., the asset purchase agreement) specifically excluded the asset sale capital gains tax from the liabilities that petitioner agreed to assume from BCA and (2) "[i]n the face of contractual language that expressly disclaims liability, [a court] cannot find that there was an implied assumption of liability." (bracketed material in original) Section 1.1(c) of the APA provided in pertinent part:

(continued...)

Petitioner argues that, even if we were to find, which we have, that petitioner assumed Castanet's obligation to be responsible for BCA's tax liability, section 4.4 of the assumption agreement precludes respondent from enforcing petitioner's assumption of that obligation.  Section 4.4 of the assumption agreement provided in pertinent part:

> except for the [Abrams] Estate who is hereby made a
> third party beneficiary to this Agreement:  (a) no
> third party is entitled to rely on any of the agree-
> ments of the parties contained in this Agreement; and
> (b) the parties assume no liability to any third party
> because of any reliance on the agreements of the par-
> ties contained in this Agreement.

According to petitioner:  (1) Respondent is a third party with respect to the assumption agreement; (2) section 4.4 of the assumption agreement provided that "the parties assume no liability to any third party" except the Abrams estate; and (3) under Illinois law a third party cannot enforce a contract that specifically disclaims liability to any third party except the third party specified in the contract.

---

[36](...continued)
Assumed Obligations shall not include * * * any taxes
of Seller [Castanet] or the Company [BCA] of any nature
due as a result of the purchase of the Shares [of BCA]
by Seller [Castanet], the sale of the Assets to Buyer
[petitioner], or the sale of the Excluded Assets by the
Company [BCA].

We reject petitioner's argument.  We have not found, and are not implying, that under section 2 of the assumption agreement petitioner assumed a tax of Castanet or a tax of BCA.  We have found that petitioner expressly assumed in section 2 of the assumption agreement Castanet's express obligation in section 5 of the SPA to be responsible for BCA's tax liability.

Respondent agrees with petitioner that under Illinois law a third party generally may not enforce a contract that specifically disclaims liability to third parties. However, respondent argues that section 4.4 of the assumption agreement, which disclaims liability to third parties except the Abrams estate, is void because it (1) violates the terms of the SPA and (2) is contrary to public policy.

With respect to respondent's argument that section 4.4 of the assumption agreement is void because it violates the terms of the SPA, respondent asserts that "Illinois law does not recognize contract provisions that interfere with a prior contract." According to respondent:

> Castanet was contractually prohibited from selling BCA's assets without securing an unrestricted assumption of BCA's tax liabilities from the asset buyer. * * * The SPA contains no disclaimer for third parties. * * * Section 4.4 [of the assumption agreement] attempts to limit petitioner's liability to run only to the [Abrams] Estate, which violates the terms of the SPA.

As we understand respondent's argument, the lack of a provision in the SPA precluding third-party beneficiaries means that the SPA allows third parties to enforce that agreement, and section 4.4 of the assumption agreement thus violates the SPA.

There is a strong presumption under Illinois law that contracting parties bargain and agree for themselves and only

incidentally for third parties.[37]  See <u>Waterford Condo. Association v. Dunbar Corp.</u>, 432 N.E.2d 1009, 1011 (Ill. App. Ct. 1982); see also <u>F.W. Hempel & Co. v. Metal World, Inc.</u>, 721 F.2d 610, 614 (7th Cir. 1983).  A third person is a direct rather than an incidental beneficiary "'only if the contracting parties have manifested in their contract an intention to confer a benefit upon the third party.'"  <u>F.W. Hempel & Co. v. Metal World, Inc.</u>, <u>supra</u> at 613 (quoting <u>Altevogt v. Brinkoetter</u>, 421 N.E.2d 182, 187 (Ill. 1981)).  In order to overcome the strong presumption under Illinois law against third-party contract beneficiaries, "the implication that the contract applies to third parties must be so strong as to be practically an express declaration."  <u>Choi v. Chase Manhattan Mortg. Co.</u>, 63 F. Supp. 2d 874, 881 (N.D. Ill. 1999).

We conclude that the lack of a provision in the SPA precluding third-party beneficiaries, standing alone, is not "so strong as to be practically an express declaration", <u>id.</u>, that the parties to the SPA intended that the SPA benefit third parties generally and respondent specifically.  We find the lack of a provision in the SPA precluding third-party beneficiaries, when considered under the strong presumption of Illinois law against

---

[37]If the benefit to a third person arising from a contract is incidental, the third person may not enforce the contract.  If the benefit to the third person arising from the contract is direct, the third person may enforce the contract.  See <u>Carson Pirie Scott & Co. v. Parrett</u>, 178 N.E. 498, 501 (Ill. 1931).

finding third-party beneficiaries to that agreement, to be fully consistent with section 4.4 of the assumption agreement, which expressly disclaims liability to third parties except the Abrams estate.

On the record before us, we reject respondent's argument that section 4.4 of the assumption agreement is void because it violates the terms of the SPA.

With respect to respondent's argument that section 4.4 of the assumption agreement is void because it is contrary to public policy, respondent asserts that if we were to enforce section 4.4 of the assumption agreement, we would encourage taxpayers to participate in transactions that are contrary to public policy because "an asset buyer in an Intermediary Transaction could insulate a stock seller from the target company's federal income tax liability while simultaneously leaving respondent, the principal creditor, unprotected."

Respondent does not explain, and we decline to speculate, how enforcing the express language of section 4.4 of the assumption agreement in this case could permit petitioner, the buyer of certain of BCA's assets, to "insulate a stock seller [the Abrams estate] from the target company's [BCA's] federal income tax liability". Respondent did not attempt to hold the Abrams estate liable under section 6901 for BCA's tax liability as a transferee of property of BCA. Nor did respondent determine in the Abrams

estate notice that respondent issued to the Abrams estate to disregard that estate's sale of its BCA stock to Castanet and to treat BCA's sale of certain of its assets as having occurred while the Abrams estate owned the stock of BCA.  If respondent had made those determinations in the Abrams estate notice, respondent would have determined a deficiency in the Abrams estate's tax attributable to the gain on the sale of those assets.[38]  Respondent did not do so.

Respondent also does not explain, and we also decline to speculate, how enforcing the express language of section 4.4 of the assumption agreement in this case could permit petitioner to "insulate" any other taxpayer involved in the Abrams estate's sale of BCA's stock to Castanet or BCA's sale of certain of its assets to petitioner, such as Castanet or UAFC,[39] from liability under section 6901 for BCA's tax liability.[40]

---

[38]BCA was an S corporation throughout the period the Abrams estate owned BCA's stock.  As a result, if respondent had treated BCA's sale of certain of its assets as having occurred while that estate owned the stock of BCA, the gain on any such sale would have flowed through to the Abrams estate as BCA's sole stock-holder.

[39]UAFC is the financial institution that made the loan to Castanet to fund its purchase of BCA stock.

[40]Respondent also does not explain how enforcing the express language of section 4.4 of the assumption agreement in this case "insulates" petitioner in all events from liability under sec. 6901.  In addition to respondent's arguments under the assumption agreement, respondent advances in this case other arguments in support of respondent's position that petitioner is liable under sec. 6901.  Although we find that section 4.4 of the assumption
(continued...)

On the record before us, we reject respondent's argument that section 4.4 of the assumption agreement is void because it is contrary to public policy.

On the record before us, we find that section 4.4 of the assumption agreement prohibits respondent from enforcing as a third-party beneficiary petitioner's assumption under the assumption agreement of Castanet's obligation under the SPA to be responsible for BCA's tax liability.

Based upon our examination of the entire record before us, we find that respondent has failed to carry respondent's burden of establishing that petitioner is liable under section 6901 as BCA's transferee under the assumption agreement.

Claimed Transferee of Property of BCA
Under the Illinois Fraudulent Transfer Statute

Respondent argues that petitioner is liable as BCA's transferee under section 5 of the Illinois fraudulent transfer statute. That section provides in pertinent part:

> **160/5.    Transfer or obligation fraudulent as to creditor; claim arising before or after transfer**
>
> § 5.    (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

---

[40](...continued)
agreement precludes petitioner from liability under sec. 6901 under the assumption agreement, that section of that agreement is not relevant to our resolution of whether petitioner is liable under sec. 6901 under respondent's remaining arguments.

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 Ill. Comp. Stat. Ann. 160/5.

Respondent asserts that BCA's sale of certain of its assets to petitioner pursuant to the APA (BCA asset sale) was fraudulent under (1) section 5(a)(2) of the Illinois fraudulent transfer statute and (2) section 5(a)(1) of that statute.[41]

Section 5(a)(2) of the Illinois Fraudulent Transfer Statute

A creditor, such as respondent here, must prove each of the elements under section 5(a)(2) of the Illinois fraudulent transfer statute by a preponderance of the evidence.[42] Wachovia Sec., LLC, v. Neuhauser, 528 F. Supp. 2d 834, 859 (N.D. Ill. 2007); Bay

---

[41]On brief, respondent advances respondent's arguments under section 5(a)(2) of the Illinois fraudulent transfer statute before advancing respondent's arguments under section 5(a)(1) of that statute. We shall consider respondent's arguments in the order in which respondent makes them on brief.

[42]We shall sometimes refer to a transfer that is fraudulent under sec. 5(a)(2) of the Illinois fraudulent transfer statute as a transfer that is fraudulent in law.

State Milling Co. v. Martin, 145 Bankr. 933, 946 (Bankr. N.D. Ill. 1992).[43]

Respondent argues that the BCA asset sale was fraudulent in law because (1) under section 5(a)(2) of the Illinois fraudulent transfer statute BCA did not receive reasonably equivalent value in exchange for the assets that it sold to petitioner and (2) under section 5(a)(2)(B) of that statute BCA intended to incur, or believed or reasonably should have believed that it would incur, a debt (i.e., the asset sale capital gains tax) that it would be unable to pay as it became due.

We turn first to respondent's argument that under section 5(a)(2) of the Illinois fraudulent transfer statute BCA did not receive reasonably equivalent value in exchange for the assets that it sold to petitioner. The parties stipulated that the asset purchase price that petitioner paid to purchase certain of BCA's assets was equal to the total fair market value of those assets. Respondent asserts:

> BCA did not retain the funds it received in exchange
> for its assets. The proceeds BCA received from the
> sale of the BCA Assets passed immediately to Castanet

---

[43]In interpreting the Illinois fraudulent transfer statute, we may rely on, inter alia, the interpretation by a U.S. bankruptcy court or other Federal court of the fraudulent transfer provisions in the U.S. Bankruptcy Code, 11 U.S.C. sec. 548 (2006), because those provisions are analogous to the provisions of the Illinois fraudulent transfer statute. See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir. 1998); Voiland v. Gillissie, 215 Bankr. 370, 374 (Bankr. N.D. Ill. 1997); Martino v. Edison Worldwide Capital (In re Randy), 189 Bankr. 425, 443 (Bankr. N.D. Ill. 1995).

[BCA's sole stockholder] and then to Rabobank, to pay off Castanet's UAFC Loan.  Thus, petitioner's payment must be disregarded in determining whether BCA received reasonably equivalent value.

The APA between BCA and petitioner required petitioner to pay the asset purchase price in accordance with the terms of the escrow agreement.[44]  The escrow agreement[45] provided in pertinent part:

RECITALS

*        *        *        *        *        *        *

D.   * * * Purchaser [petitioner] will pay or cause to be paid $25,779,369 net of proceeds and adjustments (the "Asset Purchase Price") to Castanet on the date hereof.

*        *        *        *        *        *        *

---

[44]Sec. 1.2(a) of the APA provided:

The purchase price (the "Purchase Price") for the Assets shall be Twenty Five Million Six Hundred Thirteen Thousand Three Hundred sixty Nine and No/100 Dollars ($25,613,369), payable in cash payable [sic] pursuant to the terms and provisions of the Escrow Agreement [dated July 31, 2000] * * *.

[45]Castanet, petitioner, Related LR (i.e., the owner of 70 percent of the member interests in petitioner), Hypo Bank (i.e., the bank that made the loan to petitioner to fund its purchase of certain of BCA's assets), UAFC (i.e., the financial institution that made the loan to Castanet to fund its purchase of BCA stock), Near North, and Rabobank were parties to the escrow agreement.  BCA was not a party to that agreement.  Castanet, petitioner, Related LR, and Hypo Bank appointed Near North as escrow agent under the escrow agreement.  Those entities along with Near North appointed Rabobank as sub-escrow agent under that agreement.  Since only the actions taken by Rabobank are relevant to our resolution of the issues before us, for convenience we shall refer to Rabobank as the escrow agent.  In discussing any actions taken by Hypo Bank on behalf of petitioner, for convenience we shall state that petitioner took those actions.

G.   Hypo Bank shall deposit the Asset Purchase Price into an escrow account held by Sub-Escrow Agent [Rabobank] (such amount to be referred to herein as the "Asset Purchase Escrow Amount").

H.   The Sub-Escrow Agent [Rabobank] will hold the Asset Purchase Escrow Amount in * * * Castanet Purchase Escrow Account I, Account No. * * * 9107 * * * (the "Asset Purchase Escrow Account").[46]

*         *         *         *         *         *         *

AGREEMENT

*         *         *         *         *         *         *

2.   <u>Deposits and Establishment of the Escrow Fund</u>.

*         *         *         *         *         *         *

(b)   Pursuant to the Credit Agreement [between Hypo Bank and Related LR dated as of July 31, 2000, under which Hypo Bank lent to Related LR $33,000,000, $25,779,369 of which was to be used to finance petitioner's purchase of certain of BCA's assets], Hypo Bank shall deliver to the Sub-Escrow Agent [Rabobank] the Asset Purchase Escrow Amount on the date hereof [July 31, 2000].

*         *         *         *         *         *         *

4.   <u>Payments from the Stock Purchase Escrow Fund</u>.
* * * Sub-Escrow Agent [Rabobank] shall pay to (a) the [Abrams] Estate an amount equal to $23,202,795 * * * and (b) to Escrow Agent [Near North] an amount equal to $2,207,500 * * *

5.   <u>Payments from the Asset Purchase Escrow Fund</u>

(a)   If and only if (i) the Sub-Escrow Agent [Rabobank] has received the Release Notice and (ii) the Sub-Escrow Agent [Rabobank] has previously made the wire transfers described in the first sentence of

---

[46]See <u>supra</u> note 21.

Section 4 above,[47] then Sub-Escrow Agent [Rabobank] shall pay (A) to UAFC on behalf of and for the account of Castanet, that portion of the Asset Purchase Escrow Amount equal to the amount owed to UAFC by Castanet, and (B) all other amounts in the Asset Purchase Escrow Account, if any, to Castanet or to such other Person as directed by Castanet.

As made clear by the above-quoted provisions of the escrow agreement, that agreement required petitioner to deposit the funds representing the asset purchase price into Castanet's escrow account No. 9107 at Rabobank over which Castanet, and not BCA, had control. The escrow agreement further required Rabobank, the escrow agent, to use those funds to repay on behalf of Castanet, BCA's sole stockholder, the loan that UAFC had made to Castanet to finance Castanet's purchase of BCA's stock from the Abrams estate.[48] The escrow agreement required Rabobank, the escrow agent, to pay the portion of the funds representing the asset purchase price, if any, remaining thereafter pursuant to the instructions of Castanet. The escrow agreement did not place under the control or the direction of BCA the funds representing the asset purchase price that petitioner was required by the APA and that escrow agreement to deposit into Castanet's escrow account No. 9107 at Rabobank. Instead, that escrow agreement

—————————

[47]As required by section 5(a) of the escrow agreement, Rabobank (1) received the release notice and (2) made the transfers described in the first sentence of section 4 of that agreement.

[48]See supra note 22.

placed those funds under the control and the direction of Casta-net, BCA's sole stockholder.

Petitioner complied with the APA and the escrow agreement and on August 1, 2000, deposited the funds representing the asset purchase price into Castanet's escrow account No. 9107 at Rabobank. However, in contravention of the escrow agreement, on the same date Ms. Dill, acting as the sole officer of Castanet, directed Rabobank to transfer the funds representing that purchase price from that escrow account to BCA's account No. 9090 at Rabobank. Rabobank complied with Castanet's direction on August 1, 2000. Also on August 1, 2000, Ms. Dill, acting as the sole officer of BCA, directed Rabobank to transfer the funds representing the asset purchase price from BCA's account No. 9090 at Rabobank to Castanet's account No. 9081 at Rabobank. Rabobank complied with BCA's direction on that date. On August 1, 2000, Ms. Dill, acting as the sole officer of Castanet, requested that Rabobank use any funds in Castanet's account No. 9081 at Rabobank to repay Castanet's debt to UAFC. Rabobank complied with Casta-net's direction on August 2, 2000, and used the funds in Casta-net's account No. 9081 at Rabobank, including the funds representing the asset purchase price, to repay that debt.

We have found on the record before us that petitioner was required to pay the funds representing the asset purchase price into an escrow account of Castanet at Rabobank, which Castanet

controlled, that petitioner was not required to pay those funds into an account that BCA controlled, that BCA had no right under the APA, the escrow agreement, or any other agreement to receive and/or to control those funds, and that those funds were required to be used to repay Castanet's debt to UAFC.

On the record before us, we find that under section 5(a)(2) of the Illinois fraudulent transfer statute BCA did not receive any consideration from petitioner in exchange for the sale of certain of its assets to petitioner, let alone consideration that was reasonably equivalent value.

We turn next to respondent's argument that under section 5(a)(2)(B) of the Illinois fraudulent transfer statute BCA intended to incur, or believed or reasonably should have believed that it would incur, a debt (i.e., the asset sale capital gains tax) that it would be unable to pay when it became due. In support of that argument, respondent asserts:

> Mr. Furman and Mr. Forster, the Fortrend Owners, who indirectly through SCALP owned BCA at the time the APA was executed, certainly believed or reasonably should have believed that BCA would incur a tax liability beyond BCA's ability to pay when it became due.
>
>      \*       \*       \*       \*       \*       \*       \*
>
>     The Fortrend Owners lacked any objective basis to believe that BCA's large taxable gain from the sale of its assets could be sheltered by use of the Canadian Dollars [the $68,000 (Canadian) that SCALP contributed to BCA around September 12, 2000]. The basis claimed in the Canadian Dollars was almost 400 times their fair market value. The transfer of the Canadian Dollars to BCA was part of a large tax avoidance scheme.

The Fortrend Owners' lack of belief in the basis claimed in the Canadian Dollars is revealed by the fact that they made BCA collection-proof well before the statute of limitations period expired for BCA's tax period ended December 31, 2000. The Fortrend Owners' lack of faith in the Canadian Dollars' basis is further evidenced by the fact that they did not contest the BCA SNOD [the BCA notice].

As we understand it, respondent is contending that under section 5(a)(2)(B) of the Illinois fraudulent transfer statute when BCA sold certain of its assets to petitioner BCA intended to incur, or believed or reasonably should have believed that it would incur, the asset sale capital gains tax[49] and that it would be unable to pay that tax when it became due on March 15, 2001.[50] That is because, according to respondent, the "Fortrend Owners lacked any objective basis to believe that BCA's large taxable gain from the sale of its assets could be sheltered by use of the Canadian Dollars."

---

[49]We have found that at the time BCA sold certain of its assets to petitioner BCA knew (as did petitioner) that BCA would realize a substantial gain on those assets as a result of that sale.

[50]For purposes of the Illinois fraudulent transfer statute, tax is considered as due and owing on the date on which the tax return in which the tax must be reported is required to be filed. See Hagaman v. Commissioner, 100 T.C. 180, 188 (1993); United States v. Brickman, 906 F. Supp. 1164, 1172 (N.D. Ill. 1995).

Sec. 6151(a) provides that a taxpayer shall pay the tax for the taxable period in question "at the time * * * fixed for filing the return (determined without regard to any extension of time for filing the return)." BCA was required to pay on Mar. 15, 2001, the tax for its short taxable year ended Dec. 31, 2000. See secs. 6151(a), 6072(b).

In support of respondent's assertion that the "Fortrend Owners lacked any objective basis to believe that BCA's large taxable gain from the sale of its assets could be sheltered by use of the Canadian Dollars" respondent asserts that "The basis claimed in the Canadian Dollars was almost 400 times their fair market value.  The transfer of the Canadian Dollars to BCA was part of a large tax avoidance scheme."

We have found that on July 21, 2000, Mr. Bae, an employee of Fortrend, sent a fax to Mr. Fitzgerald, an attorney at Manatt, in which Mr. Bae stated that after the Abrams estate's sale of its BCA stock and BCA's sale of certain of its assets Fortrend intended to contribute to BCA certain Canadian currency with a high basis and a low value in order to shelter the gain resulting from BCA's sale of certain of those assets.  We have also found that on September 12, 2000, SCALP, BCA's sole stockholder,[51] made a capital contribution to BCA of the Canadian currency in which SCALP claimed a tax basis of $17,268,000.  In addition, we have found that on November 1, 2000, Manatt sent Manatt's November 1, 2000 tax opinion letter to BCA and SCALP.  In that tax opinion letter, Manatt opined in pertinent part (1) that SCALP's contribution to BCA of the Canadian currency satisfied the requirements of section 351, (2) that BCA's tax basis in the Canadian currency was a carryover basis under section 362, and (3) that, based upon

_____

[51]Around Sept. 11, 2000, Castanet merged with and into BCA. As a result, SCALP owned 100 percent of the stock of BCA.

the representation of BCA and SCALP regarding SCALP's basis in the Canadian currency that SCALP contributed to BCA, BCA's tax basis in that currency was $17,268,000. In the 12/31/00 BCA return, BCA claimed a deduction for a loss on the disposition of the Canadian currency that offset all of the gain that BCA realized on the sale of certain of its assets to petitioner.

Respondent has failed to establish any facts with respect to the $17,268,000 basis (Canadian currency basis) that SCALP claimed in the Canadian currency which it contributed to BCA except that that claimed basis was about 400 times the fair market value of that currency. Respondent did not call any witnesses at the trial in this case. Respondent chose not to call as witnesses (1) Ms. Dill, the sole director and the sole officer of BCA and of Castanet, (2) Mr. Furman and Mr. Forster, the sole owners of Fortrend and the owners of over 80 percent of SCALP, or (3) any person associated with BCA, Castanet, SCALP, or Fortrend in order to examine those persons about their intent and beliefs and those of BCA and SCALP with respect to the Canadian currency basis.[52] Nor did respondent proffer documentary evidence at trial regarding those matters. As a result, we do not

---

[52]In the pretrial memorandum that respondent submitted to the Court, respondent indicated that respondent expected to call, inter alia, as witnesses (1) Mr. Kramer, an employee of Fortrend who was extensively involved in the negotiation of the SPA, the APA, and the other agreements governing the Abrams estate's sale of its BCA stock and the BCA asset sale and (2) Mr. Teig, one of Fortrend's outside accountants. However, as stated above, respondent did not call any witnesses at trial.

know when, how, or from whom SCALP obtained the Canadian currency or whether the circumstances under which SCALP obtained that currency would lead a reasonable person to accept or to question the accuracy of the basis that SCALP claimed.  Nor do we know whether or not BCA questioned the Canadian currency basis.  We know only that SCALP claimed a basis in the Canadian currency that it contributed to BCA which was 400 times the fair market value of that currency and that, in calculating the Canadian currency loss that BCA claimed in the 12/31/00 BCA return, BCA relied on Manatt's November 1, 2000 tax opinion letter and claimed the same basis.

On the record before us, we find that respondent has failed to carry respondent's burden of showing that BCA's claiming a basis in the Canadian currency that was about 400 times the fair market value of that currency, standing alone, establishes that Mr. Furman and Mr. Forster, the owners of Fortrend, "lacked any objective basis to believe" that the loss that BCA claimed on the disposition of the Canadian currency would offset the gain that it realized on the sale of certain of its assets to petitioner.

In further support of respondent's assertion that the "Fortrend Owners lacked any objective basis to believe that BCA's large taxable gain from the sale of its assets could be sheltered by use of the Canadian Dollars", respondent contends that Mr. Furman and Mr. Forster took certain actions to make "BCA

collection-proof well before the statute of limitations period expired for BCA's tax period ended December 31, 2000." Although it is not altogether clear, it appears that respondent is contending that Mr. Furman and Mr. Forster "lacked any [such] objective basis" because "well before" the period of limitations for BCA's taxable year ended December 31, 2000, had expired they took certain actions, including removing BCA's assets and dissolving BCA, that left BCA without any funds to pay the tax attributable to the BCA asset sale. We believe that respondent's contention would have merit only if Mr. Furman and Mr. Forster did not believe, or reasonably should not have believed, that the loss that BCA claimed on the disposition of the Canadian currency would offset the gain that BCA realized on the sale of certain of its assets to petitioner. If, however, Mr. Furman and Mr. Forster believed or reasonably should have believed that that loss would offset that gain, any actions of Mr. Furman and Mr. Forster to remove assets from BCA and to dissolve it before the period of limitations expired for BCA's taxable year ended December 31, 2000, would not support respondent's assertion that the "Fortrend owners lacked any objective basis" for that belief. The record is devoid of any evidence establishing what Mr. Furman and Mr. Forster (or any other person associated with BCA, Casta-

net, or SCALP) believed or reasonably should have believed regarding the basis that BCA claimed in the Canadian currency.[53]

On the record before us, we find that respondent has failed to carry respondent's burden of showing that any actions of Mr. Furman and Mr. Forster to remove BCA's assets and dissolve it before the period of limitations expired for BCA's taxable year ended December 31, 2000, establishes that they "lacked any objective basis to believe" that the loss that BCA claimed on the disposition of the Canadian currency would offset the gain that it realized on the sale of certain of its assets to petitioner.

In further support of respondent's assertion that the "Fortrend Owners lacked any objective basis to believe that BCA's large taxable gain from the sale of its assets could be sheltered by use of the Canadian Dollars", respondent contends that Mr. Furman and Mr. Forster did not contest the BCA notice. We have found that BCA dissolved on February 8, 2002. We have also found that respondent issued the BCA notice to BCA at its last known address on August 13, 2004, over 18 months after BCA had dissolved. It is not clear whether respondent was aware that BCA had dissolved at the time respondent issued that notice.[54] The

---

[53]As discussed above, respondent did not call any witnesses at the trial in this case.

[54]We have found that on Oct. 5, 2005, the second revenue officer, while attempting to collect BCA's tax liability from BCA, reviewed certain records relating to BCA that the State of Illinois maintained. It was during that review that the second

(continued...)

record does not establish who, if anyone, received the BCA notice or whether the U.S. Postal Service returned that notice as undeliverable. Nor does the record establish whether any person or entity was authorized to act on behalf of BCA, which had dissolved, in order to contest the determinations that respondent made in that notice.

On the record before us, we find that respondent has failed to carry respondent's burden of showing that any failure of Mr. Furman and Mr. Forster to contest the BCA notice establishes that they "lacked any objective basis to believe" that the loss that BCA claimed on the disposition of the Canadian currency would offset the gain that it realized on the sale of certain of its assets to petitioner.

On the record before us, we find that respondent has failed to carry respondent's burden of establishing that when BCA sold certain of its assets to petitioner it believed or reasonably should have believed that the loss that BCA claimed on the disposition of the Canadian currency would not offset the gain that it realized on that sale. On that record, we further find that respondent has failed to carry respondent's burden of establishing that under section 5(a)(2)(B) of the Illinois

---

[54](...continued)
revenue officer ascertained that BCA had filed articles of dissolution with the Illinois secretary of state on Feb. 8, 2002. The record does not establish whether or not any other representative of respondent knew before Oct. 5, 2005, that BCA had dissolved.

fraudulent transfer statute when BCA sold certain of its assets to petitioner BCA intended to incur, or believed or reasonably should have believed that it would incur, a debt that it would be unable to pay as it became due.

Based upon our examination of the entire record before us, we find that respondent has failed to carry respondent's burden of establishing that under section 5(a)(2) of the Illinois fraudulent transfer statute BCA's sale of certain of its assets to petitioner was fraudulent in law.

Section 5(a)(1) of the Illinois Fraudulent Transfer Statute

Under Illinois law, a court may not presume that a debtor made a transfer with actual intent to hinder, delay, or defraud a creditor under section 5(a)(1) of the Illinois fraudulent transfer statute.[55]  Wachovia Sec., LLC, v. Neuhauser, 528 F. Supp. 2d at 858 (citing Hofmann v. Hofmann, 446 N.E.2d 499, 506 (Ill. 1983)).  A creditor, such as respondent in this case, must prove by clear and convincing evidence each of the elements in section 5(a)(1) of the Illinois fraudulent transfer statute.  Id.  The creditor may establish a debtor's actual fraudulent intent by relying on certain factors in section 5(b) of the Illinois fraudulent transfer statute.  That section provides:

---

[55]We shall sometimes refer to the actual intent described in sec. 5(a)(1) of the Illinois fraudulent transfer statute as actual fraudulent intent.  We shall sometimes refer to a transfer that is fraudulent under sec. 5(a)(1) of the Illinois fraudulent transfer statute as a transfer that is fraudulent in fact.

**160/5.     Transfer or obligation fraudulent as to cred-
            itor; claim arising before or after transfer**

\*      \*      \*      \*      \*      \*      \*

(b) In determining actual intent under paragraph (1) of subsection (a) [of section 5], consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

740 Ill. Comp. Stat. Ann. 160/5.

No one factor in section 5(b) of the Illinois fraudulent transfer statute is dispositive in determining actual fraudulent intent under section 5(a)(1) of that statute. See <u>Levit v. Spatz</u>, 222 Bankr. 157, 168 (N.D. Ill. 1998). Moreover, as section 5(b) of the Illinois fraudulent transfer statute itself provides, the list of factors in that section is not exclusive; a court may also consider other factors not set forth in section 5(b) of the Illinois fraudulent transfer statute that it deems relevant in determining actual fraudulent intent under section 5(a)(1) of that statute. See <u>Falcon v. Thomas</u>, 629 N.E.2d 789, 796 (Ill. App. Ct. 1994). "When these 'badges of fraud' are present in sufficient number, they may give rise to an inference or presumption of fraud".[56] <u>Grochocinski v. Zeigler</u>, 320 Bankr. 362, 373 (Bankr. N.D. Ill. 2005) (citing <u>Steel Co. v. Morgan Marshall Indus., Inc.</u>, 662 N.E.2d 595, 602 (Ill. App. Ct. 1996)); see also <u>Berland v. Mussa</u>, 215 Bankr. 158, 168-170 (Bankr. N.D. Ill. 1997); <u>Kaibab Indus., Inc. v. Family Ready Homes, Inc.</u>, 372 N.E.2d 139, 142 (Ill. App. Ct. 1978).

Respondent asserts that six factors specified in section 5(b) of the Illinois fraudulent transfer statute[57] and one factor

---

[56]We shall sometimes refer to a factor from which an inference or a presumption of actual fraudulent intent may arise under sec. 5(a)(1) of the Illinois fraudulent transfer statute as a badge of fraud.

[57]Respondent does not rely on, and we shall not consider, any of the remaining five factors specified in sec. 5(b) of the
(continued...)

not specified in that section (respondent's additional factor) give rise to an inference or a presumption that under section 5(a)(1) of the Illinois fraudulent transfer statute BCA sold certain of its assets to petitioner with actual intent to hinder, delay, or defraud respondent. The six badges of fraud specified in section 5(b) of the Illinois fraudulent transfer statute on which respondent relies are: (1) The debtor's transfer was to an insider (insider factor); (2) the transfer was of substantially all of the debtor's assets (substantially all assets factor); (3) the debtor removed or concealed assets (removed assets factor); (4) the value of the consideration that the debtor received was not reasonably equivalent to the value of the assets that the debtor transferred (reasonably equivalent value factor); (5) the debtor was insolvent or became insolvent shortly after the transfer was made (insolvency factor); and (6) the transfer occurred shortly before or shortly after a substantial debt was incurred (substantial debt factor). Respondent's additional factor on which respondent relies is certain actions (discussed below) of Mr. Furman and Mr. Forster, the owners of Fortrend.

With respect to the insider factor on which respondent relies, respondent contends that BCA's sale of certain of its assets to petitioner was an indirect transfer by BCA of those assets to certain insiders of BCA who owned indirectly 30 percent

_____

[57](...continued)
Illinois fraudulent transfer statute.

of petitioner. That is because, according to respondent, certain members of BCA senior management owned all of the membership interests in LRD Group, which in turn owned 30 percent of the membership interests in petitioner.

Section 2(g) of the Illinois fraudulent transfer statute defines the term "insider" as pertinent here to include:

(2) if the debtor is a corporation,

(A) a director of the debtor;

(B) an officer of the debtor;

(C) a person in control of the debtor;

(D) a partnership in which the debtor is a general partner;

(E) a general partner in a partnership described in clause (D); or

(F) a relative of a general partner, director, officer, or person in control of the debtor;

740 Ill. Comp. Stat. Ann. 160/2(g)(2).

We have found that, effective as of the closing on July 31, 2000, of the Abrams estate's sale of its BCA stock to Castanet, (1) the members of BCA senior management resigned their positions with BCA,[58] and (2) Castanet, as the sole stockholder of BCA, elected Ms. Dill as the sole director of BCA. We have also found that on July 31, 2000, Ms. Dill, as the sole director of BCA,

---

[58]Our use of the defined phrase "BCA senior management" after the members of that management resigned their positions with BCA is only for convenience and is not intended to imply or suggest that those members continued to hold management positions with BCA.

elected herself president, secretary, and treasurer of that company.  As a result, as of the closing on August 1, 2000, of BCA's sale of certain of its assets to petitioner, no member of BCA senior management was a director or an officer of BCA.  See 740 Ill. Comp. Stat. Ann. 160/2(g)(2)(A) and (B).  Nor was any member of BCA senior management in control of BCA at the time of that sale.  See 740 Ill. Comp. Stat. Ann. 160/2(g)(2)(C). Moreover, BCA did not own any interest in petitioner, let alone a general partnership interest.[59]  See 740 Ill. Comp. Stat. Ann. 160/2(g)(2)(D) and (E).  On the record before us, we find that as of the closing on August 1, 2000, of BCA's sale of certain of its assets to petitioner the members of BCA senior management were not insiders of BCA under section 2(g)(2) of the Illinois fraudulent transfer statute.

On the record before us, we find that respondent has failed to carry respondent's burden of establishing that under section 5(b)(1) of the Illinois fraudulent transfer statute BCA's sale of certain of its assets to petitioner was a transfer of those assets to an insider.

---

[59]We have found that at the time of the BCA asset sale on Aug. 1, 2000, Related LR and LRD Group owned 70 percent and 30 percent, respectively, of the membership interests in petitioner. On that date, Related and Yukon Holdings LLC owned 90 percent and 10 percent, respectively, of the membership interests in Related LR, and Mr. Blau, the president of Related, was a member of Yukon Holdings LLC.  On Aug. 1, 2000, certain members of BCA senior management owned all of the membership interests in LRD Group.

With respect to the substantially all assets factor on which respondent relies, we have found on the basis of the parties' stipulation that the assets which BCA sold to petitioner and which petitioner purchased from BCA constituted over 90 percent of the total value, and substantially all, of BCA's assets.

On the record before us, we find that respondent has carried respondent's burden of establishing that under section 5(b)(5) of the Illinois fraudulent transfer statute BCA's sale of certain of its assets to petitioner was a transfer of substantially all of its assets.

With respect to the removed assets factor on which respondent relies, respondent contends that BCA removed virtually all of its assets because the $25,779,369 of funds representing the asset purchase price that petitioner paid to purchase certain of BCA's assets was transferred to BCA's sole stockholder, Castanet, which used those funds to repay the loan that UAFC had made to Castanet to fund Castanet's purchase of the Abrams estate's BCA stock.

Petitioner counters only that the transfer to Castanet of the funds representing the asset purchase price was a loan from BCA to Castanet. In support of that contention, petitioner alleges that certain financial statements of BCA reflected such a loan. The record does not contain any financial statements of BCA that showed a loan to Castanet as an asset of BCA or as an

item that was receivable by, or payable to, BCA.  Nor does the record contain a loan instrument, any other document, or other evidence that establishes that BCA made a loan to Castanet.

The escrow agreement[60] required that the funds representing the asset purchase price be used to repay on behalf of Castanet the loan that UAFC had made to Castanet to fund Castanet's purchase of the BCA stock from the Abrams estate.  The escrow agreement required Rabobank, the escrow agent, to pay the portion of the funds representing the asset purchase price, if any, remaining thereafter pursuant to the instructions of Castanet. The escrow agreement establishes that the parties to that agreement intended and required that the funds representing the asset purchase price be transferred on behalf of Castanet to UAFC, and not to BCA, in repayment of the loan that UAFC had made to Castanet.  As discussed more fully above, despite the unambiguous provisions of the escrow agreement, on August 1, 2000, Castanet directed Rabobank, as escrow agent, to transfer the $25,779,369 of funds representing the asset purchase price to a bank account maintained in BCA's name.  On the same date, the funds representing the asset purchase price were transferred to a bank account maintained in Castanet's name, and on August 2, 2000, Castanet used those funds to repay its debt to UAFC.

---

[60]See supra note 45 for a discussion of the parties to the escrow agreement.

On the record before us, we find that respondent has carried respondent's burden of establishing that under section 5(b)(7) of the Illinois fraudulent transfer statute BCA removed substantially all of its assets that it sold to petitioner in that the record establishes, and we have found in our consideration of whether BCA's sale of those assets to petitioner was fraudulent in law under section 5(a)(2) of the Illinois fraudulent transfer statute, that BCA did not receive any consideration in return for selling those assets to petitioner.

With respect to the reasonably equivalent value factor on which respondent relies, we have found in our consideration of whether BCA's sale of certain of its assets to petitioner was fraudulent in law under section 5(a)(2) of the Illinois fraudulent transfer statute that BCA did not receive any consideration from petitioner in exchange for the sale of certain of its assets to petitioner, let alone consideration that was reasonably equivalent value. The factor in section 5(a)(2) of the Illinois fraudulent transfer statute that is used in determining whether a transfer is fraudulent in law under that section 5(a)(2) has the same meaning as the reasonably equivalent value factor in section 5(b)(8) of the Illinois fraudulent transfer statute that is used in determining whether a transfer is fraudulent in fact under section 5(a)(1) of that statute. See Levit v. Spatz, 222 Bankr. at 167-168.

On the record before us, we find that respondent has carried respondent's burden of establishing that under section 5(b)(8) of the Illinois fraudulent transfer statute BCA did not receive any consideration from petitioner in exchange for the sale of certain of its assets to petitioner, let alone consideration that was reasonably equivalent value.

With respect to the insolvency factor on which respondent relies, section 3 of the Illinois fraudulent transfer statute provides in pertinent part:

**160/3. Insolvency; assets; debts**

> § 3. (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

740 Ill. Comp. Stat. Ann. 160/3. In determining insolvency under section 5(b)(9) of the Illinois fraudulent transfer statute, any contingent liability of BCA is to be taken into account. See Bay State Milling Co. v. Martin, 145 Bankr. 933, 949 (Bankr. N.D. Ill. 1992).

Respondent contends that any tax attributable to the gain that BCA realized on the sale of certain of its assets to petitioner constitutes a contingent liability of BCA at the time of the BCA asset sale.[61] According to respondent,

---

[61]In the BCA notice, respondent determined a deficiency in BCA's tax of $7,507,972. Virtually all of that deficiency, which petitioner does not contest in this case, is attributable to the asset sale capital gains tax.

BCA was insolvent upon the transfer of the BCA Assets to petitioner, because BCA had inadequate assets with which to pay the resulting federal income taxes. The test under Illinois law for insolvency includes contingent liabilities; thus, BCA was insolvent immediately upon the sale of the BCA Assets, not when its federal income tax payment came due.

Petitioner counters that from August 1, 2000, the date of the closing of the BCA asset sale, through December 31 of that year (1) BCA held as an asset a $25,779,369 loan receivable from Castanet, and (2) BCA's assets, including that loan receivable, exceeded its liabilities. We have found in our consideration of the removed assets factor that the record does not contain evidence establishing that the transfer to Castanet of the $25,779,369 asset purchase price constituted a loan from BCA to Castanet. On the record before us, we reject petitioner's contentions that from August 1 through December 31, 2000, (1) BCA held as an asset a $25,779,369 loan receivable from Castanet, and (2) BCA's assets exceeded BCA's liabilities.

Petitioner further counters respondent's contentions regarding the insolvency factor as follows:

Although the test for insolvency under Illinois law includes contingent liabilities, the tax liability in question here was not a contingent liability and cannot, as a matter of law, be included in the insolvency analysis. "A contingent liability under Illinois law means a liability that already exists but which will become absolute upon the happening of a certain event." Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat, No. 92 C 20259, 1996 WL 67216, *1 (N.D. Ill. Feb. 16, 1996) (citations omitted). Under Illinois law, therefore, BCA's potential tax liability was not a contingent liability because it did not yet exist in such a

way that the happening of a certain event would make it absolute. BCA's tax liability would not exist at all "until the end of the calendar year," Reid Ice Cream Corp. v. Commissioner, 59 F.2d 189, 191 (2d Cir. 1932), and no one event could make that liability absolute because any activities of the corporation before the end of the year would alter the potential liability.

Although it is not altogether clear, it appears that petitioner is contending that, because during BCA's short taxable year ended December 31, 2000, BCA might have engaged in additional transactions or activities that might have reduced or eliminated the asset sale capital gains tax, that tax may not be treated as a contingent liability for purposes of section 5(b)(8) of the Illinois fraudulent transfer statute. We disagree. Even if during its short taxable year ended December 31, 2000, BCA might have engaged in additional transactions or activities that might have reduced or eliminated the tax attributable to BCA's sale of certain of its assets to petitioner, that tax nonetheless was a contingent liability as of and immediately after that sale. See Climatrol Indus., Inc. v. Fedders Corp., 501 N.E. 2d 292 (Ill. App. Ct. 1986); see also Browning-Ferris Indus. of Ill., Inc. v. Ter Maat, No. 92 C 20259 (N.D. Ill. Feb. 16, 1996).

On the record before us, we find (1) that as a result of BCA's sale of certain of its assets to petitioner on August 1, 2000, BCA had a contingent liability for the tax attributable to that sale and (2) that as of that sale and immediately thereafter

BCA was insolvent because its liabilities, including that contingent liability, exceeded its assets.[62]

On the record before us, we find that respondent has carried respondent's burden of establishing that under section 5(b)(9) of the Illinois fraudulent transfer statute BCA was insolvent as of and immediately after it sold certain of its assets to petitioner.

_____

[62]We have found that BCA did not receive the funds representing the asset purchase price. We made that finding even though on Aug. 1, 2000, at Castanet's direction and in contravention of the escrow agreement, those funds were deposited into a bank account of BCA and on the same day transferred from that account to a bank account of Castanet, which used those funds on Aug. 2, 2000, to repay Castanet's debt to UAFC. Even if we had not so found, on the record before us, we find that when the funds representing the asset purchase price were transferred on Aug. 1, 2000, from a bank account of BCA to a bank account of Castanet, BCA's liabilities, including the contingent liability for the asset sale capital gains tax, exceeded its assets, and BCA was insolvent.

Assuming arguendo that the asset sale capital gains tax were not a contingent liability of BCA as of the BCA asset sale, petitioner agrees that that tax was a liability at the end of BCA's short taxable year ended Dec. 31, 2000. We have found that BCA included Schedule L with the 12/31/00 BCA return. In that schedule, it reported total assets of $3,277,516 on Dec. 31, 2000, which was substantially less than the tax attributable to the BCA asset sale. The insolvency factor considers whether "the debtor was insolvent or became insolvent shortly after the transfer". 740 Ill. Comp. Stat. Ann. 160/5(b)(9) (West 2002) (emphasis added). We have found no authority defining the term "shortly after" that is used in the insolvency factor in sec. 5(b)(9) of the Illinois fraudulent transfer statute. Assuming arguendo that the asset sale capital gains tax were not a contingent liability at the time of the BCA asset sale on Aug. 1, 2000, but became a liability on Dec. 31, 2000, we would conclude that under sec. 5(b)(9) of the Illinois fraudulent transfer statute BCA became insolvent shortly after that sale.

With respect to the substantial debt factor on which respondent relies, respondent contends that BCA incurred a substantial debt (i.e., the asset sale capital gains tax) at the time it sold its assets to petitioner.

Although petitioner agrees that BCA incurred a substantial debt consisting of the asset sale capital gains tax, petitioner asserts that that tax "did not become a debt until BCA's return was required to be filed [on March 15, 2001]."[63] The substantial debt factor considers whether "the transfer occurred <u>shortly before</u> or shortly after <u>a substantial debt was incurred</u>". 740 Ill. Comp. Stat. Ann. 160/5(b)(10) (emphasis added). We have found no authority defining the term "shortly before" that is used in the substantial debt factor in section 5(b)(10) of the Illinois fraudulent transfer statute.[64] Assuming arguendo that the asset sale capital gains tax did not become a debt of BCA until March 15, 2001, the date on which BCA was required to file its return for its taxable year ended December 31, 2000, we would conclude that under section 5(b)(10) of the Illinois fraudulent

---

[63]We find petitioner's assertion regarding the substantial debt factor to be inconsistent with petitioner's agreement in advancing its contentions regarding the insolvency factor that the liability for the asset sale capital gains tax existed at the end of BCA's taxable year ended Dec. 31, 2000. See <u>supra</u> note 62.

[64]Nor have we found any authority defining the term "shortly after" that is used in the substantial debt factor in sec. 5(b)(10) of the Illinois fraudulent transfer statute.

transfer statute BCA's sale of certain of its assets to peti-tioner occurred shortly before that debt was incurred.

On the record before us, we find that respondent has carried respondent's burden of establishing that under section 5(b)(10) of the Illinois fraudulent transfer statute BCA's sale of certain of its assets to petitioner occurred shortly before a substantial debt (i.e., the asset sale capital gains tax) was incurred.

With respect to respondent's additional factor on which respondent relies, respondent contends:

> The actions of the Fortrend Owners [Mr. Furman and Mr. Forster] constitute an additional badge of fraud. The Fortrend Owners operated Fortrend, a tax shelter enter-prise, and SCALP, whose *raison d'etre* was facilitating Intermediary Transactions. Non-payment of the taxes at issue in this case was the Fortrend Owners' objective in structuring the BCA Intermediary Transaction.

In support of the above-quoted contentions, respondent relies primarily on the Fortrend brochure that Fortrend had circulated between 1997 and November 2003 and Notice 2001-16, 2001-1 C.B. 730 (Notice 2001-16), that respondent published on February 26, 2001.

We turn first to the Fortrend brochure. That brochure stated in pertinent part in a section entitled "BUY STOCK/SELL ASSETS TRANSACTION, EXECUTIVE SUMMARY":

> We are working with various clients who may be willing to buy the stock from the seller and then cause the target corporation to sell its net assets to the ulti-mate buyer. These clients have certain tax attributes that enable them to absorb the tax gain inherent in the assets.

In certain situations the economic cost of the client's involvement is sufficiently low that a seller of stock can increase its after-tax sale proceeds, a buyer of net assets can decrease its after-tax purchase price (on a present value basis), and the client can still make an arbitrage profit.

*       *       *       *       *       *       *

As with any transaction, economic substance and proper form are crucial to its success.  Accordingly, in transactions where involvement by such a client may make sense, raising the idea at the earliest stages of a transaction is advisable.

As we understand respondent's contentions in support of respondent's additional factor, respondent assumes that any transaction described in the section of the Fortrend brochure entitled "BUY STOCK/SELL ASSETS TRANSACTION, EXECUTIVE SUMMARY" that reduces or minimizes tax is improper because it is inconsistent with or in violation of the Code.  We reject any such assumption.  We have found nothing in that section that leads us to conclude that the transaction described therein, standing alone, constitutes a transaction that would improperly reduce or minimize tax.  Indeed, that section expressly stated that "economic substance and proper form are crucial to its [the transaction's] success."

We turn now to Notice 2001-16.  As we understand it, respondent is contending that, because respondent in that notice characterized as a tax shelter a transaction that appears to resemble the transaction described in the section of the Fortrend brochure entitled "BUY STOCK/SELL ASSETS TRANSACTION, EXECUTIVE

SUMMARY", Fortrend was a "tax shelter enterprise".[65]  On the record before us, we reject any such contention for reasons that are essentially the same as the reasons that we set forth above in rejecting respondent's assumption about the transaction described in that section of the Fortrend brochure.

On the record before us, we find that respondent has failed to carry respondent's burden of establishing that under section 5(b) of the Illinois fraudulent transfer statute "The actions of the Fortrend owners [Mr. Furman and Mr. Forster] constitute" a badge of fraud.

On the record before us, we find that respondent has failed to carry respondent's burden of establishing respondent's additional factor under section 5(b) of the Illinois fraudulent transfer statute.

We have found that respondent has carried respondent's burden of establishing the following five badges of fraud under section 5(b) of the Illinois fraudulent transfer statute: (1) The substantially all assets factor, (2) the removed assets factor, (3) the reasonably equivalent value factor, (4) the

---

[65]We note that respondent indicated in Notice 2001-16, 2001-1 C.B. 730, that respondent might challenge the transactions identified in that notice by seeking to recharacterize them in a manner that was more consistent with what respondent claimed was their substance.  In the present case, respondent expressly abandons advancing any argument of respondent described in that notice.  See supra note 35.

insolvency factor, and (5) the substantial debt factor.[66]  Based upon our examination of the entire record before us, we find that those badges of fraud raise only a suspicion that under section 5(a)(1) of the Illinois fraudulent transfer statute BCA acted with actual intent to hinder, delay, or defraud in selling certain of its assets to petitioner.  If when BCA sold certain of its assets to petitioner it had believed or reasonably should have believed that the loss that it claimed on the disposition of the Canadian currency would offset the gain that it realized on that sale, those facts would belie respondent's contention that under section 5(a)(1) of the Illinois fraudulent transfer statute BCA sold those assets with actual fraudulent intent.  If when BCA sold certain of its assets to petitioner it had believed or reasonably should have believed that that loss would not have offset that gain, those facts would support respondent's contention that under section 5(a)(1) of the Illinois fraudulent transfer statute BCA sold those assets with actual fraudulent intent.

---

[66]We have found no case in which a court has held that the presence of five badges of fraud creates an inference or a presumption of actual fraudulent intent under sec. 5(b) of the Illinois fraudulent transfer statute.  See Grochocinski v. Zeigler, 320 Bankr. 362, 373 (Bankr. N.D. Ill. 2005) (no fraud found despite presence of six badges of fraud); Voiland v. Gillissie, 215 Bankr. at 379 (fraud found where six badges of fraud present); Berland v. Mussa, 215 Bankr. 158, 170 (Bankr. N.D. Ill. 1997) (fraud found where seven badges of fraud present).

We have found that respondent, who has the burden of establishing by clear and convincing evidence BCA's actual fraudulent intent under section 5(a)(1) of the Illinois fraudulent transfer statute, has failed to carry respondent's burden of establishing that when BCA sold certain of its assets to petitioner it believed or reasonably should have believed that the loss that it claimed on the disposition of the Canadian currency would not offset the gain that it realized on that sale.

Based upon our examination of the entire record before us, we find that respondent has failed to carry respondent's burden of establishing by clear and convincing evidence that under section 5(a)(1) of the Illinois fraudulent transfer statute BCA acted with actual intent to hinder, delay, or defraud respondent when it sold certain of its assets to petitioner.

Claimed Transferee of Property of
BCA Under Respondent's "Trust Fund Doctrine"

Respondent argues that petitioner is liable as BCA's transferee under respondent's trust fund doctrine.  The three elements of respondent's trust fund doctrine are:[67]

> (1) a transferee receives assets from a corporation, (2) the transferee pays the consideration for the assets to someone other than the transferor corporation, and (3) the transferor corporation is unable to pay its debts * * *.

---

[67]We shall consider only respondent's articulation of a doctrine in equity known as a trust fund doctrine.  We shall not consider other articulations of so-called trust fund doctrines in equity that arise in contexts not presented in this case.

Respondent claims to have "distilled" the above-quoted three elements of respondent's trust fund doctrine from the following statements of certain "principles of equity" (principles of equity) by the U.S. Court of Appeals for the Seventh Circuit in Shepard v. Commissioner, 101 F.2d 595, 598-599 (7th Cir. 1939), affg. Hunt v. Commissioner, 36 B.T.A. 268 (1937):

> Likewise, in a case where corporation A transfers all of its assets to B for a consideration which B pays to C, then B, regardless of any agreement, is liable for any unpaid income tax, which represents the profits made on such transfer on the theory that B is a trustee, to the extent of the value of the property which it acquired from A.
>
>     *       *       *       *       *       *       *
>
>     Equally clear and definite must be the holding that one who dispossesses another company of all of its assets, paying the consideration therefor to a third party, and leaving the propertyless corporation unable to pay its debts, including taxes which were inchoate at the time, becomes a trustee and liable in such trusteeship for taxes and other debts in an amount not exceeding the value of the property taken from the debtor taxpayer.  This is so * * * because of the application of principles of equity. * * *

In distilling respondent's trust fund doctrine from the above-quoted passages in Shepard, respondent ignores or fails to acknowledge the underlying rationale that the Court of Appeals gave for the principles of equity that that court set forth in Shepard.  According to the Court of Appeals,

>     The theory of these holdings is that courts of equity will protect creditors from fraudulent action on the part of the debtors by holding the recipient of the

> debtor's property as a trustee thereof for the benefit
> of the creditors of said debtor.

Id. at 599.

This Court's predecessor, the Board of Tax Appeals, set forth the principles of equity and the rationale for those principles in a manner very similar to that of the Court of Appeals in Shepard.  According to that Board,

> where assets of a corporation are sold for an equiva-
> lent consideration, which under an agreement is paid to
> the stockholders, leaving the corporation without
> assets to satisfy its creditors, the purchasing corpo-
> ration is liable to creditors of the selling corpora-
> tion to the extent of the value of the property re-
> ceived, the sale being in fraud of creditors and the
> purchaser being a party to such fraud through his
> knowledge that the result of the transaction must
> necessarily leave such creditors with no assets from
> which to satisfy their claims.

Hunt v. Commissioner, supra at 277.

The courts developed the principles of equity set forth in Shepard and Hunt as an exception to the well-settled general rule in the majority of States in the United States, including the State of Illinois, "that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation."  Vernon v. Schuster, 688 N.E.2d 1172, 1175-1176 (Ill. 1997); see Stewart Title Guar. Co. v. Commissioner, 15 T.C. 566, 573 (1950); Gideon-Anderson Co. v. Commissioner, 20 B.T.A. 106, 108-109 (1930); Cmty. Ins. Servs., Ltd. v. United Life Ins. Co., No. 05-CV-4105-JPG (S.D. Ill. Sept. 13, 2007).  That exception to that general rule applies "where

the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." <u>Vernon v. Schuster</u>, <u>supra</u> at 1175-1176; see <u>Shepard v. Commissioner</u>, <u>supra</u> at 599; <u>Hunt v. Commissioner</u>, <u>supra</u> at 277; <u>Gideon-Anderson Co. v. Commissioner</u>, <u>supra</u> at 109; <u>Cmty. Ins. Servs., Ltd. v. United Life Ins. Co.</u>, <u>supra</u>.

In determining whether to apply the so-called fraud exception to the well-settled general rule in Illinois that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation and therefore whether to apply the principles of equity set forth in <u>Shepard</u>, <u>Hunt</u>, and other caselaw, it is necessary to determine whether the transaction in question was for the fraudulent purpose of avoiding liability for the transferor's obligations. See <u>Shepard v. Commissioner</u>, <u>supra</u> at 599; <u>Hunt v. Commissioner</u>, <u>supra</u> at 277; <u>Gideon-Anderson Co. v. Commissioner</u>, <u>supra</u> at 109; <u>Cmty. Ins. Servs., Ltd. v. United Life Ins. Co.</u>, <u>supra</u>; <u>Vernon v. Schuster</u>, <u>supra</u> at 1175-1176. In determining under Illinois law whether the transaction was for such a fraudulent purpose, it is appropriate to look to the badges of fraud in section 5(b) of the Illinois fraudulent transfer statute that are used in determining actual fraudulent intent under section 5(a)(1) of that statute. See <u>Davila v. Magna Holding Co.</u>, No. 97 C 1909 (N.D. Ill. Feb. 28, 2000).

We have found that respondent has failed to carry respondent's burden of establishing that BCA's sale of certain of its assets to petitioner was a fraudulent transfer under section 5(a)(1) and (b) of the Illinois fraudulent transfer statute.[68]  A fortiori, on the record before us, we find that respondent has failed to carry respondent's burden of establishing that that sale comes within the fraud exception to the well-settled general rule in Illinois that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation.  On that record, we further find that respondent has failed to carry respondent's burden of establishing that BCA's sale of certain of its assets to petitioner requires the application to that sale of the principles of equity set forth in Shepard v. Commissioner, supra.

Based upon our examination of the entire record before us, we find that respondent has failed to carry respondent's burden of establishing that petitioner is liable as BCA's transferee under respondent's trust fund doctrine.

Conclusion

Based upon our examination of the entire record before us, we find that respondent has failed to carry respondent's burden

---

[68]We have also found that respondent has failed to carry respondent's burden of establishing that BCA's sale of certain of its assets to petitioner was a fraudulent transfer under sec. 5(a)(2) of the Illinois fraudulent transfer statute.

of establishing that petitioner is liable as a transferee of property of BCA under section 6901.[69]

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.

---

[69]Our resolution of the various questions and issues presented here depends on the facts that we have found on the record before us and on respondent's burden of proof.  Nothing herein is intended to be, or should be read as, reaching or implying any finding or conclusion in other cases that are not before us.